**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**Michael HINES, Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

**v.**

**James M. HALL, Jr., Defendant–
Appellant.**

**Nos. 90–5514, 90–5523.**

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 8, 1991.

Decided July 31, 1991.

As Amended Aug. 12, Aug. 20
and Aug. 23, 1991.

---

**2.** Attorney Mills does not challenge the amount of damages requested by Hasbro, only the pro-    priety of the sanction.

John B. Boatwright, III, Boatwright & Linka, Richmond, Va., argued for defendant-appellant Hines.

David Preston Baugh, Richmond, Va., argued for defendant-appellant Hall.

Stephen Wiley Miller, Asst. U.S. Atty., Richmond, Va., argued (Henry E. Hudson, U.S. Atty., on brief), for plaintiff-appellee.

Before HALL, Circuit Judge, CHAPMAN, Senior Circuit Judge, and MULLEN, District Judge for the Western District of North Carolina, sitting by designation.

## OPINION

PER CURIAM:

Two defendants appeal their convictions and sentences in the trial court below. Finding no error in the conduct of the trial or in the imposition of the sentences, we will affirm.

On December 7, 1989, James M. Hall, Jr. arrived in Richmond on a bus from New York City. Michael Talbert and David Farmer, two Richmond police officers, were conducting a plainclothes surveillance of the Richmond bus terminal. The police officers were attempting to locate an individual they believed was transporting cocaine into Richmond. The suspect sought by the officers was not on the bus, but the officers' attention was drawn to Hall.

Farmer noticed that while Hall was on the bus he had two carry-on bags. Hall emerged from the bus without any luggage, however, and conducted an inspection of the bus terminal. Farmer testified that Hall approached each gate in the terminal, looking out every door and in the alcove areas on either side of each door. During this tour of the terminal, Hall also looked into the coffee shop and gift shop, and checked the main entrance of the terminal. After completing his search of the terminal, Hall went back to the bus and retrieved one of the bags.

Hall walked to the main entrance and advanced through the first set of doors. At this time Michael Hines entered through a second set of doors from the exterior of the bus terminal, meeting Hall in the area enclosed by the doors. Hall transferred the bag to Hines and turned back into the terminal. Hines exited the building. Officers Talbert and Farmer, their suspicions being aroused by this course of conduct, decided to follow Hines into the bus terminal's parking lot.

Farmer twice called out to Hines and asked to speak to him, but Hines did not acknowledge the request in any way. Farmer then asked to speak to Hines again, but for the first time identified himself as a police officer and displayed his badge. At this time Hines was a few feet from a rental car bearing New Jersey license plates and occupied by a driver. Hines opened the passenger door, placed the bag in the car and said something to the driver. Hines turned back toward the officers and the bus terminal, and Talbert made an investigative stop. Because Hines was wearing a bulky coat, Talbert conducted a weapons pat down at the outset of the stop.

During this time, Farmer watched the driver of the car. Farmer observed the driver looking at him and apparently handling something under the seat of the car. Talbert announced to Farmer that he felt what appeared to be a bullet in Hines' pocket. At the same time, the driver of the car began to reach for the bag that Hines had placed on the front seat. Fearing that the driver and the bag might pose a threat, Farmer reached inside the car to remove

the bag. In removing the bag from the car, Farmer felt the barrel of a gun through the fabric of the bag. Hines and the driver were then placed under arrest for concealed weapons and handcuffed.

Subsequent to the arrest Farmer opened the bag to disarm the weapon inside and discovered two loaded pistols and a smaller plastic bag. Patting the plastic bag revealed that it also contained a weapon, later discovered to be yet another revolver. The smaller plastic bag was also found to contain crack and cocaine packaged for street distribution. While Farmer was discovering and unloading the weapons inside the bag, Talbert returned to the bus station and apprehended Hall. In a search incident to the arrest Hall was found to be carrying a substance later determined to be LSD.

Hines and Hall were indicted and tried on drug and firearm charges stemming from the incident. Hall was convicted of conspiracy to possess with intent to distribute in excess of 5 grams of cocaine base and cocaine hydrochloride (18 U.S.C. § 371), one count of possession with intent to distribute more than 5 grams of cocaine base (21 U.S.C. § 841), one count of possession with intent to distribute cocaine (21 U.S.C. § 841), one count of carrying a firearm during the commission of a drug offense (18 U.S.C. § 924(c)), and simple possession of LSD (21 U.S.C. § 844). Hines was convicted of conspiracy to possess with intent to distribute in excess of 5 grams of cocaine base and cocaine hydrochloride (18 U.S.C. § 371), one count of possession with intent to distribute more than 5 grams of cocaine base (21 U.S.C. § 841), one count of possession with intent to distribute cocaine (21 U.S.C. § 841), one count of carrying a firearm during the commission of a drug offense (18 U.S.C. § 924(c)), and one count of possession of a firearm by a convicted felon (18 U.S.C. § 922(g)(1)).

Prior to trial Hall and Hines moved to suppress the evidence seized by the police officers subsequent to the search. This motion was denied by the trial court.

When the jury was selected for the trial of the case, one of the prospective jurors, who worked part time at a chemical dependency program, indicated that she had contact with individuals who had been involved with drugs. However, when asked if she could decide the case based solely on the evidence presented in court and not on outside influence, she said she thought she could.

During the trial of the case the district court allowed Martin Minsky, Hines' New York state parole officer, to testify that Hines was a convicted felon and that he had not sought permission to travel outside of New York in violation of his parole restrictions. Minsky also testified that such permission was easily obtained and could have been granted to allow the defendant to make the trip to Richmond for business or social purposes. The defendant objected to any testimony regarding his parole restrictions.

Finally, after conviction, the district court determined that Hall was a career criminal because he had two prior convictions in New York, although he had received concurrent sentences for those prior convictions. The court also departed upward from the sentencing guidelines in sentencing Hines based upon a determination that the sentencing guidelines did not adequately take into account Hines' prior criminal record or likelihood that he would commit additional crimes. The defendants have appealed their convictions and sentences.

I.

The defendants sought to suppress the weapons and drugs found by the police, claiming that Hines had been unlawfully detained and searched outside the bus terminal. If this initial search and seizure had not occurred none of the evidence would have been discovered. Conversely, the initial search and seizure conducted against Hines led directly to the discovery of the weapons and the arrests of both Hall and Hines. Thus the admissibility of all of the seized contraband hinges on the propriety of the initial stop.

In making an investigative stop in accordance with *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), a policeman is not required to assert a probable cause basis for believing that criminal activity is underway. Rather, an officer may stop a person when he has "reasonable articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." *United States v. Place,* 462 U.S. 696, 702, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983). Having detained a person, an officer may make a limited patdown to ascertain that the individual does not possess a weapon or pose a threat to his safety. *United States v. Gilliard,* 847 F.2d 21 (1st Cir.1988), *cert. den.* 488 U.S. 1033, 109 S.Ct. 846, 102 L.Ed.2d 978 (1989); see also, *Terry v. Ohio, supra.*

In the present case Farmer and Talbert had seen Hall, an apparent cohort of Hines, conduct a meticulously thorough inspection of each entrance to the bus terminal immediately upon arriving by bus from New York. Hall then retrieved one of two bags he had left on the bus and delivered the bag to Hines, who only momentarily entered the entranceway to the bus terminal itself. This activity in and of itself is sufficient to raise the suspicion that a crime, specifically the transfer of contraband or valuables of dubious legitimacy, is taking place. *United States v. Whitehead,* 849 F.2d 849 (4th Cir.1988), *reh. den., cert. den.* 488 U.S. 983, 109 S.Ct. 534, 102 L.Ed.2d 566 (1988).

The police were within their rights to follow Hines (and the bag) to observe what other actions might occur or to attempt to question Hines. Hines ignored the officers' attempt to engage him in voluntary conversation, though, and continued on his way. Having received no response to their entreaties, Talbert and Farmer chose to identify themselves as policemen. Hines still did not speak to the officers, but did react by quickening his pace toward the rental car bearing New Jersey plates. Upon reaching the car Hines placed the bag inside of the vehicle.

The police had now seen the bag arrive from New York, change hands two times in a matter of seconds, and end up in a car bearing New Jersey plates, following a careful inspection of the scene of exchange by the individual who originally held the bag. Such a surveillance and an apparent pre-arranged series of quick transfers are sufficient to justify a brief investigatory stop of the participants in the exchange based upon a "founded suspicion" that criminal activity is taking place. *Terry v. Ohio, supra.* See also, *United States v. Jaramillo,* 891 F.2d 620 (7th Cir. 1989), *cert. den.* —— U.S. ——, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990). In making the investigatory stop the officers separated, one stopping Hines as he turned to return to the terminal, the other moving into position to observe the driver of the car. Having stopped Hines who was wearing a heavy jacket, Talbert was permitted to make a brief pat down to insure that he was not confronting an armed man. *Adams v. Williams,* 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972). *See also, United States v. Hammack,* 604 F.2d 437 (5th Cir.1979).

While frisking Hines, Talbert found a bullet. Simultaneous with this discovery, the driver of the car reached for the bag on the seat beside him and Farmer snatched the bag away. In removing the bag from the reach of a suspect Farmer felt the barrel of a gun. This discovery permitted Farmer to open the bag to search for and disarm the weapon he had felt through the bag's lining. *United States v. Silva,* 745 F.2d 840 (4th Cir.1984), *cert. den.* 470 U.S. 1031, 105 S.Ct. 1404, 84 L.Ed.2d 791 (1985). When he then opened the bag, additional weapons were discovered. Because the discovery of all of the weapons stemmed from the permissible pat down search of Hines and the reaction of the suspects to this pat down, the weapons were properly seized. The trial court did not err by denying the defendants' motion to suppress.

## II.

During the jury selection at the subsequent trial of the case one juror indicated that she was familiar with the effects of

drugs on society and drug abuse on individuals. Her knowledge derived from her personal experience as a part-time employee in a chemical dependency unit. Although the juror spoke up when the jury pool was asked if any members had held a negative view of drugs, this alone is not sufficient to disqualify a juror:

> "While knowledge that criminal conduct sometimes leads to tragic results may create a bias towards crime, bias or prejudice towards crime does not disqualify one to sit as a juror in a criminal case so long as those feelings do not lead to a predisposition toward the prosecution or accused."

*United States v. Tegzes*, 715 F.2d 505, 507 (11th Cir.1983).

In this case the trial court further probed into this potential juror's ability to remain impartial by asking if she could put aside any personal feelings she might have about drug use and judge the case on the evidence adduced at trial. The juror replied, "I think so." The defendant objected to seating the juror, arguing that this was an ambiguous statement. However, the trial court deemed it to be a sufficiently affirmative expression of acceptance of the juror's duty to judge the case solely on the evidence presented in court. Additionally, the trial court specifically instructed all of the jurors that this was their duty.

■ The mere fact that a juror states that he "thinks," "hopes" or "would try" to weigh the evidence impartially after he has previously expressed an opinion about drugs generally, is not sufficient to require the juror to be excused. *United States v. Jones*, 865 F.2d 188 (8th Cir.1989), *United States v. Casey*, 835 F.2d 148 (7th Cir. 1987). It may be appropriate for such a response to provoke additional inquiry to determine if "I think so" reflects any hesitancy, but the trial court is in the best position to determine the assertiveness of such a response. *Casey, supra,* 835 F.2d at 151. In this case, nothing indicates that the trial court erred in judging the response to demonstrate an acceptance of the juror's responsibility. In fact, it is informative to note that the defendants left the

challenged juror on the panel despite the fact that the defendants had additional peremptory challenges left with which they could have removed her.

### III.

During the course of the trial itself the court allowed Hines' New York state parole officer to testify that Hines was a previously convicted felon on parole at the time of the offense. The parole officer further testified that Hines had left New York without obtaining prior permission, as was required under his conditions of supervision. The officer stated that such permission was routinely granted for business or social visits. Hines objected to this line of testimony.

■ Hines does concede that testimony from his parole officer was required in order to prove an element of the offense of possession of a firearm by a convicted felon. From this testimony, given by a state parole officer, it would necessarily be revealed to the jury that Hines was on parole at the time of the offense. While in the ordinary course of most criminal trials revelations of the defendant's parole status might provoke a mistrial because it would inform the jury that the defendant had a prior criminal history, *United States v. McCarthy*, 470 F.2d 222 (6th Cir.1972), *United States v. James*, 208 F.2d 124 (2d Cir.1953), the government was *required* to prove that the defendant had a prior criminal history as an element of the offense charged in this case. Hines' status as a parolee was little more than incidental information.

It should also be pointed out that by proceeding in this fashion, the trial court prevented far more damaging evidence from reaching the jury. The government originally sought to introduce Hines' judgment of conviction from the state courts of New York. That judgment would have revealed to the jury that Hines' prior conviction had been for murder. By requiring the government to adduce evidence of Hines' conviction through testimony rather than through documentation, the trial court

prevented the jury from learning that Hines was in fact a convicted murderer.

■■■■■ Hines complains, however, that in addition to informing the jury that Hines was on parole, the officer was allowed to testify that Hines had violated the terms of his release by failing to obtain approval to travel outside of New York. This testimony implicates Federal Rules of Evidence 403 and 404(b). Rule 403 requires the trial judge to balance the probative value of any proffered evidence against its prejudicial effect, while Rule 404(b) allows the admission of other crimes or acts which might tend to prove "motive, opportunity, intent, preparation ... [or] plan." Evidentiary holdings under these rules are reviewed under an abuse of discretion standard. *United States v. Hadaway*, 681 F.2d 214 (4th Cir.1982), *United States v. Gustafson*, 728 F.2d 1078 (8th Cir.1984), *cert. den.* 469 U.S. 979, 105 S.Ct. 380, 83 L.Ed.2d 315 (1984).

Testimony that Hines violated his probation by travelling to Virginia without prior approval was pertinent to show that he may have had an intention to violate the law at the time he left New York. It also tends to show that, in accepting contraband from Hall at the bus terminal, he was voluntarily following through on a plan or preparations that had been developed well in advance of the act itself and was not acting by mistake or at the "spur of the moment." The trial court did not abuse its discretion by permitting this evidence to reach the jury.

### IV.

Finally, both Hines and Hall object to the sentences they received, claiming the trial court incorrectly applied the Federal Sentencing Guidelines in determining appropriate sentencing ranges. The sentencing judge made an upward departure in sentencing Hines and determined Hall to be a career offender. Both of these determinations were correct.

■■■■ Initially Hines was determined to have a criminal history category of III and a guideline range of 75–97 months. The sentencing judge felt that category III under-represented "the seriousness of the defendant's criminal history ... [and] the likelihood that he will commit further [crimes]." Guidelines Section 4A1.3. Hines received a criminal history category III because the guidelines treated as a single offense two prior felony murder convictions. The convictions arose from separate armed robberies occurring on different days and resulting in the unrelated murders of two different victims. Had the sentencing for these offenses occurred independent of one another, Hines would have been classified as a career criminal even if he had been sentenced to concurrent terms. Guidelines Section 4B1.1. Nevertheless, the state of New York consolidated the sentencing dates for these offenses, which requires them to be treated as a "single offense" under the guidelines. Guidelines Section 4A1.2.

■■■■ The trial judge felt that Hines' true record revealed him to be a recidivist. The court then departed upward, sentencing Hines as if he were a career criminal, based on the conclusion that the guidelines treatment of the murders as a single offense was inadequate. This court has held that departures will be reviewed under a two part test: (1) whether the particular circumstances of the offense, as supported by the facts, were adequately taken into consideration by the guidelines; and (2) whether a departure can be supported by those circumstances not taken into account in the guidelines. *United States v. Summers*, 893 F.2d 63 (4th Cir.1990). In this case such an analysis leads to affirmation of the trial court's upward departure.

■■■■ The guidelines do take into account the possibility that an offender may be sentenced for multiple related offenses at one time and properly count such an incident as a single offense. Nothing in the guidelines, however, indicates that such a calculation is designed to treat more leniently a defendant who is fortuitously sentenced at one hearing on two disparate charges. Hines' previous murders did not arise from a single incident or criminal spree, but were committed during two un-

related robberies. The fact that these murders were definitionally treated as a single offense under the guidelines, does not bar the determination that they were factually distinct, and thus, not properly considered under the guidelines. An upward departure is permitted when the defendant has committed two unrelated murders which are counted a single offense under the guidelines. *United States v. Nichols*, 912 F.2d 598 (2d Cir.1990).

██ Similarly, Hall was properly classified as a career criminal under the guidelines for multiple prior crimes of violence he had committed. Hall argues that he had not been convicted of any one of these prior crimes before he was caught and convicted of all of them. Therefore, Hall argues, he does not have two prior convictions under the guidelines. Under Hall's view, a defendant would have to commit a crime, be caught, convicted, sentenced and released, then commit a second crime and again be caught, convicted, sentenced and released, before he could commit the third crime which would make him a career criminal. This argument is contradicted by the clear language of the guidelines. Guidelines Section 4B1.1 states:

"A defendant is a career offender if ... (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense."

The guidelines then define "two prior felony convictions" as "at least two felony convictions" sustained prior to the offense for which the defendant is being sentenced. Guidelines Section 4B1.2. Nothing in the guidelines state that these convictions must be separated by an intervening period of incarceration and release. So long as the convictions have not been obtained in a proceeding which was consolidated for trial or sentencing, they count as separate convictions, and result in the application of career criminal status upon a third conviction.

Although Hall was not arrested for any prior offense which counts toward his career criminal status until after he had committed all of the offenses which allow this conviction to result in career status, he does have three different sentences imposed by three different judges in two different jurisdictions. Although all of these sentences were meted out during a four day period, they nevertheless constitute separate convictions under the guidelines.

In conclusion we find that the district court afforded the defendants a fair trial free from error and properly imposed sentence under the requirements of the sentencing guidelines. For the foregoing reasons, the judgment of the district court is

AFFIRMED.