Filed: February 10, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

————————————

Nos. 95-5983(L)
(CR-93-407-MJG)

————————————

United States of America,

Plaintiff - Appellee,

versus

Sean Andre Bullock, etc., et al,

Defendants - Appellants.

————————————

O R D E R

————————————

The court amends its opinion filed January 27, 2000, as follows:

On page 7, first paragraph, line 2 -- a new footnote 4 is added, which reads:  "We note that Hester is represented by new counsel on this appeal.  Neither Mr. Goldstein nor his law firm represented Hester during the trial."  Footnotes previously numbered 4-11 are renumbered 5-12.

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

SEAN ANDRE BULLOCK, a/k/a Derrick

Taylor, a/k/a Big Man, a/k/a
Kenneth Taylor, a/k/a Tyrone
Harris,
<u>Defendant-Appellant.</u>

No. 95-5983

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

BYRON MELVIN GEORGE, a/k/a Amar
Bomani Mawusi-Zulu,
<u>Defendant-Appellant.</u>

No. 95-5984

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

STEVEN ERNEST HESTER, a/k/a Melvin

Ball, a/k/a Bobo, a/k/a Byron
Melvin Falls, a/k/a Owen Price,
a/k/a Owen Davis, a/k/a Bob, a/k/a
Melvin Ball, Jr., a/k/a U.S.A.,
<u>Defendant-Appellant.</u>

No. 96-4028

Appeals from the United States District Court
for the District of Maryland, at Baltimore.
Marvin J. Garbis, District Judge.
(CR-93-407-MJG)

Argued: December 3, 1999

Decided: January 27, 2000

Before NIEMEYER and WILLIAMS, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Arthur Samuel Cheslock, Baltimore, Maryland; Martin H.
Schreiber, II, BROWN, GOLDSTEIN & LEVY, L.L.P., Baltimore,
Maryland, for Appellants. John Vincent Geise, Assistant United
States Attorney, Bonnie S. Greenberg, Assistant United States Attor-
ney, UNITED STATES ATTORNEY'S OFFICE, Greenbelt, Mary-
land, for Appellee. **ON BRIEF:** Daniel F. Goldstein, BROWN,
GOLDSTEIN & LEVY, L.L.P., Baltimore, Maryland, for Appellant
Hester; Gerald D. Glass, Towson, Maryland, for Appellant Bullock.
Lynne A. Battaglia, United States Attorney, UNITED STATES
ATTORNEY'S OFFICE, Greenbelt, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

2

**OPINION**

PER CURIAM:

Appellants Steven Ernest Hester, Byron Melvin George, and Sean Andre Bullock were named along with four other defendants in an eleven-count indictment alleging various federal drug and firearm offenses. Hester was charged in nine counts; George was charged in eight counts; and Bullock was charged in five counts. Appellants were tried together with two other defendants, Dawon Markham and Steven Wright, in the United States District Court for the District of Maryland.**1** After a two-and-a-half-month trial and several days of deliberation, the jury returned a verdict acquitting Markham and Wright on the single count in which they were named, convicting Bullock on three counts, convicting George on four counts, and convicting Hester on one count. The jury was unable to reach a verdict on two of Hester's other counts.

Hester and Bullock were sentenced to life imprisonment and George received a thirty-year sentence. Appellants now appeal, asserting that various errors were made at their trial that warrant reversal. In addition, Bullock argues that he should not have received a life sentence. We disagree and affirm Appellants' convictions and sentences.

I.

In March 1993, State's Attorneys for Prince George's County and Howard County, Maryland applied for permission to intercept phone conversations on phone lines associated with a suspected drug organization believed to be led by Hester. The applications requested wiretaps in Prince George's County and Howard County. In support of the applications, Prince George's County Police Detective Maurice Hicks

_____

**1** As noted above, two other codefendants were also named in the indictment. One, Lawrence Day, testified on the Government's behalf in exchange for the Government's agreement that he would be prosecuted on state charges only. The other, Clyde Robinson, was originally prosecuted with Appellants, but the Government dismissed the indictment against him on the eighth day of trial.

and FBI Special Agent Steven Stowe (the affiants) supplied an accompanying affidavit.[2] The 100-plus page affidavit described in detail the investigations into the Hester drug operation to date and highlighted Hester's reputation for violence, including his suspected involvement in several murders. One of the murders involved an individual who had attempted to cooperate with police concerning Hester's criminal activity. The affidavit also documented information learned through unidentified tipsters and confidential sources. The affidavit delineated several alternative investigative procedures that had already been utilized unsuccessfully in the investigation and concluded that a wiretap was a necessary investigative technique to prosecute successfully Hester and his cohorts. The affidavit expressly noted, among other things, that efforts to infiltrate the organization were not attempted because they "reasonably appear[ed] to be too dangerous." (J.A. at 120.) The affidavit also discussed the difficulties involved in relying on interviews with persons connected with the conspiracy:

> Based on our experience and the experience of other law enforcement officers involved in this investigation, we believe that interviews of persons who could assist with this investigation would not be successful because the persons who are knowledgeable about the content of the conversations and illegal transactions are the direct participants in the conversations and transactions and are themselves the targets of this investigation. Numerous interviews of other persons who may be able to assist this investigation have been attempted and have been unsuccessful primarily because such individuals fear for their physical safety or because of their own culpability. Many persons who have been interviewed during this investigation or prior investigations of criminal activity involving some of these targets have stated that Steven Ernest Hester has a violent temper and is known to retaliate against people who interfere with his illegal activities.

_____

[2] Virtually identical affidavits accompanied the applications for the Prince George's County and Howard County wire intercept orders.

4

(J.A. at 163.) Maryland state court judges for Prince George's County and Howard County ordered the wire intercepts and the phone lines were monitored for about a month.

Evidence gathered from the wire intercepts implicated Appellants in various drug offenses and several arrests were made at the conclusion of the investigation. Many of the coparticipants in the Hester drug ring agreed to testify for the Government, including Lawrence Day and Steven Brown. Day was originally named in the indictment, but later entered an agreement with the Government to testify against Appellants in exchange for being prosecuted only at the state level with a recommended sentence of ten years. Day's testimony was damaging to Appellants, as he testified that he knew Appellants and that he had engaged in illegal drug activities with them.

Day's testimony revealed that he had provided information to the police concerning Hester and Bullock on three past occasions in 1991 and 1992. Day had once received $500 for the information he provided and had given the police his phone number and pager number. The Government contends that the information Day provided to police concerned Hester and Bullock's participation in violent activities and did not include information related to illegal drug activities. The Government claims that Day was essentially a tipster on limited occasions. Day's own testimony supports the Government's portrayal. Day testified that he was not involved in drug-related activities when he went to the police and that he did not provide any information related to drug dealing.

Conversations intercepted through the wiretaps also indicated that Hester obtained drugs from New York and evidence presented at trial verified Hester's connection to New York. Steven Brown testified that George had told him about a trip he was taking to New York. Brown stated that George had told him that he was going to New York to purchase cocaine for Hester. After testifying to Hester's involvement in this New York transaction, however, Brown indicated that George had not told him that anyone else was "getting any drugs" out of the trip to New York. (J.A. at 284-85.) The prosecution then asked, "Was Steve Hester involved in this transaction?" (J.A. at 285.) Brown answered, "I didn't really know if [George was] getting some

for Steve Hester. [George] told me that he was going for Steve Hester, but I don't know if it was for him or not." (J.A. at 285.)

George returned from this trip to New York on April 14, 1993. On that day, George and an unindicted coparticipant, April Davis, arrived in Washington, D.C. on a bus from New York. After getting off the bus, the two were together briefly and then moved to opposite sides of the street as they walked away from the bus station. Davis was carrying her seven-month-old daughter and a diaper bag.[3] Police confronted George and Davis and, pursuant to a consensual search of Davis's diaper bag, discovered a quantity of cocaine base. Both George and Davis were arrested.

Hester testified in his own defense that although he was involved in selling heroin, he never sold cocaine as alleged in the indictment. According to a Government expert witness's report, drug paraphernalia seized from Hester's girlfriend's apartment contained confirmed traces of heroin. At trial, Hester's attorney asked this witness if he had also discovered any traces of cocaine on one of these items, a razor blade. The expert witness responded that he had in fact found small, unconfirmable traces of cocaine on a few exhibits. On redirect, the Government asked the expert to explain his answer. The expert testified that, as his notes reflected, he had found small traces of cocaine on various drug-related items seized from Hester's girlfriend's residence but did not include this information in his report because the traces were too small to confirm. Hester and his codefendants had received a copy of the expert's notes and report prior to trial.

Throughout the trial, Appellants moved for severances and mistrials. Among the reasons cited in support of these motions were Hester's occasionally unruly courtroom behavior, Hester's testimony allegedly implicating his codefendants, Appellants' use of defenses that were purportedly antagonistic to one another, and conduct by

_____

[3] Testimony from an expert witness indicated that drug dealers often used women with children as drug couriers because police would tend not to focus on these women. A female witness who was involved in the Hester organization also testified that she had brought her daughter along on drug business at Hester's urging "[b]ecause it would look better if [she] had a child with [her]." (J.A. at 489.)

6

Hester's defense counsel that resulted in the trial judge admonishing the attorney.[4] Perhaps the most dramatic event that caused each Appellant to move for a mistrial and severance occurred on the thirty-third day of trial as the jury was returning to the courtroom following a recess in Hester's testimony. As the jury was entering, George "slugged" Hester, knocking him to the floor. (J.A. at 636.) A police detective who was in the courtroom at the time of the incident recounted what he saw for the record: "I didn't actually see anybody hit anybody. . . . But after the incident, as everybody was walking away, I observed Byron George kind of smile and wink at Hester on the floor. To me, it looked planned." (J.A. at 644.) The trial judge voir dired the jury concerning the incident. Most of the jurors indicated that they had not seen what happened. Many jurors indicated, however, that they had seen Hester on the floor and, based upon where George was standing, concluded that George had hit Hester. No juror indicated that the incident would affect his or her ability to judge the case in any way, although some stated that they did not "think" it would have an effect. After conducting this voir dire of the jury, the district court provided a limiting instruction.[5]

At the conclusion of the presentation of evidence, the jury deliberated for several days. The jury returned a verdict acquitting Markham and Wright on the single count in which they were named, conspiracy to distribute and possess with intent to distribute cocaine base, in vio-

_____

[4] We note that Hester is represented by new counsel on this appeal. Neither Mr. Goldstein nor his law firm represented Hester during the trial.

[5] The instruction was as follows:

> We had an unfortunate incident, and I'm confident that it's not going to be repeated. In any event, as I have explained to each one of you, it doesn't have to do with this case in terms of your judging this case. It's based strictly on the evidence.
>
> I want to feel very, very secure -- and you've all promised me this -- that when this case gets to you, which I hope will be fairly soon, that every defendant and the government will each get a fair trial based on the evidence, and that events such as occurred here have nothing to do with it.
>
> After it's all over, we can talk about anything you want to talk about with regard to this event, but it is a non-subject from now on. It is simply not to be discussed at all.

(J.A. at 675.)

lation of 21 U.S.C.A. § 846 (West 1999). Hester was convicted on one count for possession with intent to distribute cocaine base, 21 U.S.C.A. § 841(a)(1) (West 1999). Hester was acquitted on six counts and the jury was unable to reach a verdict on two counts concerning conspiracy to distribute and possess with intent to distribute cocaine base, 21 U.S.C.A. § 846, and using a juvenile to distribute cocaine base, 21 U.S.C.A. § 861(a)(1) (West 1999). George was convicted on four of the eight counts in which he was named: conspiracy to distribute and possess with intent to distribute cocaine base, 21 U.S.C.A. § 846, two counts of possession with intent to distribute cocaine base, 21 U.S.C.A. § 841(a)(1), and use of a minor to assist in avoiding detection of a drug crime, 21 U.S.C.A. § 861(a)(2) (West 1999). Bullock was convicted on three of the five counts in which he was named: conspiracy to distribute and possess with intent to distribute cocaine base, 21 U.S.C.A. § 846, and two counts of possession with intent to distribute cocaine base, 21 U.S.C.A. § 841(a)(1).

After the trial, the district court denied Appellants' motions to suppress the evidence from the wiretaps and for a new trial. Both motions argued that the wiretap applications were faulty.

Hester and Bullock received life sentences and George received a sentence of thirty years imprisonment. All three now appeal, alleging that various errors were committed at their trial. In addition, Bullock challenges his life sentence. We address Appellants' arguments below.

II.

Appellants first contend that the wiretap authorization was invalid, and, therefore, all evidence gained from the wire intercepts should have been suppressed. Appellants argue that the affidavit connected with the applications for wire intercept authorization in Prince George's County and Howard County failed adequately to disclose the availability of Lawrence Day to infiltrate the Hester drug organization. Because of this purported omission, Appellants assert that the so-called "exhaustion" requirement of the Maryland wiretap statute

was not complied with. We disagree and affirm the district court's ruling that the wiretap authorization was valid.**6**

In United States v. Glasco, 917 F.2d 797 (4th Cir. 1990), we intimated that when a state court authorizes a wiretap, as was done here, state wiretapping law should govern the admissibility of the wiretap evidence in federal court. See id. at 799. In this case, we will determine whether the wire intercept evidence was properly admitted under Maryland law, although we note that the relevant provision, Maryland's "exhaustion" requirement, is identical to federal wiretap law, and, thus, whether we analyze this case under state or federal law is of little consequence.**7**

Although we have indicated that we will review deferentially an issuing court's finding that the application satisfied the "exhaustion" requirement, we have heretofore not enunciated a specific standard of review. See United States v. Smith, 31 F.3d 1294, 1298 (4th Cir. 1994). We need not settle this question of the proper standard of review now, because we are convinced that under even the least deferential standard the applications for the wire intercept orders issued in this case easily satisfied the "exhaustion" requirement.

Maryland law requires strict compliance with all "preconditions" to obtaining a wiretap. See, e.g., Allen v. State, 597 A.2d 489, 493 (Md.

_____

**6** We also reject Appellants' argument that the purported failure of the Howard County Chief of Police to receive formal notification under Md. Ann. Code art. 27, § 298(f)(2)(ii) (1996) of Detective Hicks's and Special Agent Stowe's authorization to conduct wire intercepts in Howard County somehow requires suppression of the wiretap evidence. We note that Appellants are unable to cite any support for this proposition and our independent research uncovered none.

**7** Under Maryland law, an application for an order authorizing a wiretap must contain "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Md. Code Ann., Cts. & Jud. Proc., § 10-408(a)(3) (1998). Officials applying for a wiretap, therefore, must demonstrate that they have "exhausted" other alternative methods of surveillance and that a wiretap is necessary. The federal wiretap statute contains an identical provision. 18 U.S.C.A. § 2518(1)(c) (West 1970).

9

Ct. Spec. App. 1991). The failure to comply with a "precondition" set forth in the wiretap statute "requires suppression of <u>all</u> the evidence obtained under the wiretap." <u>State v. Mazzone</u>, 648 A.2d 978, 980 (Md. 1994). As noted above, among these "preconditions" is the requirement that applicants seeking wiretap orders provide "[a] full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." Md. Code Ann., Md. Cts. & Jud. Proc., § 10-408(a)(3) (1998). The disjunctive nature of this requirement permits the wiretap applicant to

> establish the need for a wiretap by showing <u>either</u> (i) that normal investigative procedures have been tried and failed, <u>or</u> (ii) that normal investigative procedures, though not yet tried, reasonably appear to be either unlikely to succeed if tried or too dangerous. In reality this gives the government three alternative ways to establish the need for a wiretap.

<u>Smith</u>, 31 F.3d at 1298 n. 2 (construing the exhaustion requirement contained in the federal wiretap statute) (internal quotation marks and citations omitted).

The affidavit attached in support of the applications for wiretap orders plainly met this exhaustion requirement. First, the affidavit set forth in detail the investigative techniques attempted to date in bringing the Hester organization to justice. Among the numerous techniques discussed in the affidavit were the use of tipsters and confidential sources. Second, the affidavit added that further attempts to rely on interviews with persons knowledgeable about the Hester organization would likely be futile because many of those persons would themselves be targets of the investigation. <u>See</u>, <u>e.g.</u>, <u>Bell v. State</u>, 429 A.2d 300, 303 (Md. Ct. Spec. App. 1981) ("The government need not prove to a certainty that such techniques will not succeed if -- as stated in the statute -- it reasonably appears to be unlikely to succeed." (internal quotation marks and alterations omitted)). Finally, the affidavit provided a detailed account of Hester's suspected involvement in various violent activities, including the murders of several persons, and concluded that attempts to infiltrate the conspiracy "reasonably appear[ ] to be too dangerous." (J.A. at 120.) We believe that Hester's reputation for violence alone, as out-

10

lined in the affidavit, amply supported the need for a wiretap. As we noted in <u>Smith</u>, any one of these grounds would suffice to satisfy the exhaustion requirement. Here, the applicants met all three methods of establishing the need for the wiretap as set forth under the "exhaustion" provision.

In its 100-plus pages, the affidavit "full[y] and complete[ly]" informed the issuing judges of previously attempted investigatory techniques and the reasons why a wiretap was thought necessary. Furthermore, contrary to Appellants' assertions, the affidavit can easily be read to reference Lawrence Day himself. The affidavit discussed the prior use of tipsters to learn about Hester's criminal activity. Day was an occasional tipster. The affidavit also indicated that attempts to interview persons who could assist in the investigation had been unsuccessful, and future attempts likely would be unsuccessful as well because those persons are "themselves the targets of this investigation" and, in any event, these attempts would be extremely dangerous. Day was himself a "target" in the investigation, as evidenced by his arrest and subsequent prosecution under state law, and the affiants could reasonably conclude that attempts to use Day to infiltrate the drug conspiracy would be unsuccessful.

For these reasons, we hold that the applications for wiretaps in this case strictly complied with the "exhaustion" requirement under Maryland's wiretap law.

III.

Having concluded that the requests for wiretaps in this case met the requirements of Maryland's wiretap statute, we turn now to Appellants' alternative argument that the district court should have held a <u>Franks</u> evidentiary hearing, <u>see Franks v. Delaware</u>, 438 U.S. 154 (1978),**8** to determine the integrity of the affidavit when it learned that

_____

**8** In <u>Franks</u>, the Supreme Court held that in certain limited situations a defendant can attack the validity of an affidavit in support of a search warrant in an evidentiary hearing. <u>See Franks v. Delaware</u>, 438 U.S. 154, 171 (1978). We have extended the <u>Franks</u> rule to situations involving affidavits in support of wiretaps as well. <u>See</u> , <u>e.g.</u>, <u>United States v. Muldoon</u>, 931 F.2d 282, 286 (4th Cir. 1991) (holding that a <u>Franks</u> hearing was unwarranted because the defendant failed to make the necessary preliminary showing).

11

the affiants may have omitted relevant information concerning Day's availability to infiltrate the Hester organization. A <u>Franks</u> hearing is appropriate only when "affiants omit material facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading" and when the omission is "necessary to the finding of probable cause." <u>United States v. Colkley</u>, 899 F.2d 297, 300-01 (4th Cir. 1990) (internal quotation marks omitted).

In this case, we find the district court's denial of a <u>Franks</u> hearing eminently reasonable. There is no factual support for the contention that the affiants intended to mislead the issuing judge, and we further conclude that the affidavit was not misleading. The affidavit set forth information that can fairly be read to reference Day's limited role as a tipster in prior police investigations into the Hester organization. In addition, the affiants explicitly stated that they believed that relying on persons connected with the conspiracy would be unsuccessful. Certainly, Day would be included in this group. Moreover, even if the affidavit's failure explicitly to spell out the full extent of Day's previous involvement served to mislead the issuing judge, we find that any omission was unnecessary to finding probable cause to order the wiretap. Given the Hester organization's reputation for violence, as spelled out in the affidavit, even if Day were available to penetrate the drug ring, the affiants' conclusion that attempts to infiltrate the organization would be too dangerous amply establishes probable cause to order the wiretap. We therefore hold that the district court did not err in concluding that a <u>Franks</u> hearing was unwarranted.

IV.

Appellants next argue that their cases should have been severed from one another under Federal Rule of Criminal Procedure 14.**9**

---

**9** Federal Rule of Criminal Procedure 14 provides in relevant part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

Fed. R. Crim. P. 14.

12

Appellants made numerous requests for severance throughout the forty-four-day trial and the district court repeatedly denied the motions. The basis for these motions ranged from Hester's courtroom outbursts to perceived antagonistic defenses. "[T]he decision to deny severance, which is within the sound discretion of the district judge, will not be overturned unless the defendant affirmatively demonstrates a clear abuse of discretion through having been deprived a fair trial and having suffered a miscarriage of justice." United States v. Spitler, 800 F.2d 1267, 1271-72 (4th Cir. 1986).

We hold that the district court did not abuse its discretion in this case. "The basic rule is that persons who have been indicted together, particularly for conspiracy, should be tried together." United States v. Tipton, 90 F.3d 861, 883 (4th Cir. 1996). The Supreme Court has made clear that a Rule 14 severance should be granted only in exceptional cases in which "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." Zafiro v. United States, 506 U.S. 534, 539 (1993). The Zafiro Court stressed that even if the risk of prejudice to a codefendant is high, "limiting instructions . . . often will suffice to cure any risk of prejudice." Id. Moreover, as we noted in United States v. Porter, 821 F.2d 968 (4th Cir. 1987), "[n]o prejudice exists if the jury could make individual guilt determinations by following the court's cautionary instructions, appraising the independent evidence against each defendant. Convictions should be sustained if it may be inferred from the verdicts that the jury meticulously sifted the evidence." Id. at 972.

Here, all Appellants were named in the same indictment and charged with, among other things, conspiracy to distribute and possess with intent to distribute cocaine base; thus, there was a presumption that they should be tried together. In addition, the district court instructed the jury: (1) that the Government has the burden of proving beyond a reasonable doubt that each defendant individually committed the crimes with which he was charged; (2) that the jury must consider each defendant separately; and (3) that each defendant was entitled to have his case decided based solely upon the evidence applicable to him. This type of instruction is entirely consistent with the one approved of in Zafiro, and would have cured any risk of prejudice. See Zafiro, 506 U.S. at 541. Furthermore, in this case the jury's

13

verdicts demonstrate that it carefully "sifted" through the evidence and followed the district court's instructions. The jury acquitted two defendants outright, convicted Hester on only one count while reaching an impasse on two other counts, and convicted Bullock and George on three and four counts, respectively. These verdicts clearly indicate that the jury was able to consider each defendant separately and heed the trial judge's instructions. We are confident that the joint trial of Appellants did not deprive them of a fair trial or result in a miscarriage of justice, and we affirm the district court's decision not to grant a severance.

V.

Because Appellants specifically argue that they should have received a mistrial based upon the incident in which George slugged Hester as the jury was reentering the courtroom following a recess, we consider the incident separately. The denial of a motion for mistrial, like a denial of a motion for severance, is reviewed for abuse of discretion. See United States v. West, 877 F.2d 281, 287-88 (4th Cir. 1989). As we stated in West, "[a] defendant must show prejudice in order for the court's ruling to constitute an abuse of discretion, and no prejudice exists if the jury could make individual guilt determinations by following the court's cautionary instructions." Id. at 288.

In this case, the incident in question was ably handled by the trial judge and did not prejudice Appellants. Following this incident, the district court voir dired the jury and no juror indicated that he or she would be unable to judge the case properly based only upon the evidence.[10] After conducting this voir dire, the district court provided the following limiting instruction:

_____

[10] Appellants stress that some jurors stated that they did not "think" the incident would affect their ability to judge the case. Appellants claim that these jurors were "ambivalent" about whether they could properly decide the case. (Appellants' Br. at 36.) We have determined before that simply because a juror responds that she "thinks" she can properly judge a case fairly does not warrant dismissing her. See United States v. Hines, 943 F.2d 348, 353 (4th Cir. 1991). In Hines, we explained that "[i]t may be appropriate for such a response to provoke additional inquiry to determine if `I think so' reflects any hesitancy, but the trial court is in the best position to determine the assertiveness of such a response." Id. Similarly, here, we find that the district court was in the best position to conclude whether the jurors adequately indicated that they could fairly judge the case.

14

> We had an unfortunate incident, and I'm confident that it's not going to be repeated. In any event, as I have explained to each one of you, it doesn't have to do with this case in terms of your judging this case. It's based strictly on the evidence.
>
> I want to feel very, very secure -- and you've all promised me this -- that when this case gets to you, which I hope will be fairly soon, that every defendant and the government will each get a fair trial based on the evidence, and that events such as occurred here have nothing to do with it.
>
> After it's all over, we can talk about anything you want to talk about with regard to this event, but it is a non-subject from now on. It is simply not to be discussed at all.

(J.A. at 675.)

The district court thus, in addition to carefully questioning the jurors about George and Hester's incident, provided appropriate cautionary instructions. Again, as demonstrated by the jury's verdicts, the jury was able to heed the district court's instructions and consider each defendant separately based only upon the evidence presented at trial. We think that the manner in which the trial judge handled the incident was more than adequate even without considering his unequaled position to determine the effect the incident might have had on the jury. We also note that a ruling that a mistrial was required would "encourage future misconduct by defendants" because "it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so." West, 877 F.2d at 288 (internal quotation marks omitted). Because we are convinced that Appellants were not prejudiced by the incident involving George and Hester, we affirm the district court's ruling denying the motion for mistrial.

VI.

Appellants argue that the Government violated 18 U.S.C.A. § 201(c)(2) (West Supp. 1999), when it presented testimony from witnesses that had received promises from the Government that they

15

would not be prosecuted for their roles in the drug conspiracy. This argument is foreclosed by binding Circuit precedent. See United States v. Richardson, 195 F.3d 192, 196-97 (4th Cir. 1999) (holding that the Government does not violate § 201(c)(2) when it "act[s] in accordance with its statutory authority to use immunity, leniency, and plea agreements to obtain truthful testimony").

VII.

Hester argues that the testimony of the Government's expert witness concerning small, unconfirmable traces of cocaine that were found on various drug-related items seized from Hester's girlfriend's apartment was inadmissible because this information was not disclosed in the witness's summary or report, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(E). We review the district court's ruling on the admissibility of expert testimony for an abuse of discretion. See Cavallo v. Star Enterprise, 100 F.3d 1150, 1153-54 (4th Cir. 1996).

At trial, an expert witness for the Government was asked on cross-examination by Hester's counsel whether he had found any traces of cocaine on a razor blade.[11] The expert answered that he actually had found small, unconfirmable traces of cocaine on a few of the exhibits. Hester's attorney quickly moved on to other areas of interrogation. On redirect, the Government inquired into this subject concerning the small traces of cocaine. The expert witness explained that he had found small traces of cocaine on various drug-related items, but that in no case were the amounts large enough to confirm. This information was all contained in his notes, which he had provided to the defense before trial.

Rule 16(a)(1)(E) requires the Government to provide at the defendant's request a written summary of the testimony that its expert witnesses intend to present during the Government's case-in-chief. See Fed. R. Crim. P. 16(a)(1)(E). In this instance, the information concerning small amounts of cocaine was included in the expert's notes,

_____

[11] The expert's report indicated that he had found traces of heroin on the razor blade and the expert testified to this fact immediately before Hester's defense attorney asked about traces of cocaine.

16

but not in his summary or report as something about which he intended to testify.

We hold that the district court did not abuse its discretion in allowing this expert's testimony. The expert did not include his finding of small traces of cocaine in his summary or report because, as he testified, they were too small for him to confirm and the Government did not intend to introduce this evidence. When asked point blank on cross-examination whether he had found any traces of cocaine, the expert correctly testified that he had in fact found some small traces as reflected in his notes. Hester cannot now complain about truthful testimony that his own questioning directly elicited. Nor can he claim he was surprised by this information when he was undisputably provided a copy of the expert's notes prior to trial.

VIII.

Hester also argues that the Government asked an impermissibly leading question of Steven Brown that resulted in Hester's conviction.**12** We review the district court's rulings on leading questions for a "clear abuse of discretion," and such rulings will not be overturned absent "prejudice or clear injustice to the defendant." <u>United States v. Durham</u>, 319 F.2d 590, 592 (4th Cir. 1963).

We find no such prejudice here. While testifying to the events surrounding George's arrest in Washington, D.C., Brown twice indicated that George had told him that George was going to New York to purchase drugs on Hester's behalf. Following this testimony, the prosecution asked Brown whether anyone else was "getting any drugs out of this trip [to New York]" and Brown answered "No." (J.A. at 284-85.) The prosecution then followed up by asking,"Was Steve Hester involved in this transaction?" (J.A. at 285.) Brown responded: "I didn't really know if [George was] getting some for Steve Hester. [George] told me that he was going for Steve Hester, but I don't know if it was for him or not." (J.A. at 285.) The Government's question

_____

**12** Federal Rule of Evidence 611(c) expresses a preference against the use of leading questions on direct examination: "Leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." Fed. R. Evid. 611(c).

17

was thus intended to clarify Brown's earlier testimony in which he testified that George went to New York for Hester. Because "no new information was elicited by the question and [Brown's] answer was merely repetitive" of his prior testimony, we hold that the district court did not abuse its discretion in allowing the Government to ask Brown if Hester was involved in the transaction. See Durham, 319 F.2d at 593.

IX.

We turn now to George's argument that there was insufficient evidence to support his conviction for using a juvenile to assist in avoiding detection for a drug offense, under 21 U.S.C.A. § 861(a)(2) (West 1999). When reviewing a sufficiency-of-the-evidence challenge on direct appeal, we must sustain the verdict "if there is substantial evidence, taking the view most favorable to the Government," Glasser v. United States, 315 U.S. 60, 80 (1942), including all reasonable inferences that can be drawn, see United States v. Russell, 971 F.2d 1098, 1109 (4th Cir. 1992), to support the conviction.

Section 861(a)(2) provides in relevant part: "It shall be unlawful for any person at least eighteen years of age to knowingly and intentionally . . . employ, hire, use, persuade, induce, entice, or coerce, a person under eighteen years of age to assist in avoiding detection or apprehension [for a drug offense]." 21 U.S.C.A. § 861(a)(2). George's conviction under this statute was founded upon the events surrounding his Washington, D.C. arrest on April 14, 1993. On that day, George and a travel companion, April Davis, were arrested after arriving in Washington by bus from New York. The two were arrested because police found a quantity of cocaine base in a diaper bag that Davis was carrying. Davis also had her seven-month-old daughter with her. George was convicted for his role in this incident and on appeal does not contest the sufficiency of the evidence for his conviction for the underlying substantive drug offense; instead, he argues only that there was insufficient evidence to support a finding that Davis's infant was used "to assist in avoiding detection."

We conclude that there was substantial evidence to support George's conviction under this statute. Although there was no direct evidence that the infant was used to avert suspicion, the jury reason-

18

ably could have drawn the inference that the infant's presence was intended to help avoid detection. The drugs were hidden in a diaper bag -- a bag that would look conspicuously out of place without an accompanying baby. The infant's presence clearly appears to have been intended to throw law enforcement officials off the couriers' trail. Furthermore, evidence presented at trial indicated that drug dealers were known to use women with children in transporting drugs and that the participants in the Hester organization had employed such practices before. Given all of this evidence, we hold that the Government's evidence sufficiently supported George's conviction under § 861(a)(2).

X.

Finally, Bullock argues that he should not have been sentenced to life imprisonment under 21 U.S.C.A. § 841(b)(1)(A) (West 1999) for having two prior felony convictions for drug offenses because he did not receive the benefit of counsel for one of those drug convictions.

We reject Bullock's argument because we agree with the district court's conclusion, which we review for clear error, see United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989), that Bullock waived his right to counsel in the proceeding that resulted in the conviction he now disputes. Moreover, we note that Bullock would have received a life sentence even if he had not been sentenced under the § 841(b)(1)(A) provision because his base offense level was 44.

XI.

Having carefully considered Appellants' arguments, we reject each of them and affirm their convictions and sentences.

AFFIRMED

19