**UNITED STATES of America**

**v.**

**Allen Edward STEWART, Defendant.**

**No. CRIM. 01–144–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

June 27, 2001.

Patricia M. Haynes, Morris R. Parker, Jr., U.S. Attorney's Office, Alexandria, VA, for Plaintiff.

Jeffrey Daniel Zimmerman, Alexandria, VA, for Defendant.

### *MEMORANDUM OPINION*

ELLIS, District Judge.

Defendant Allen Edward Stewart has moved to suppress all evidence recovered pursuant to a traffic stop that resulted in his arrest and the seizure of marijuana, weapons, and drug paraphernalia in his possession. The questions presented by defendant's motion are (i) whether the police officer had a reasonable, articulable suspicion warranting the initial traffic stop; (ii) whether the officer was justified in requiring defendant to step out of his car; and (iii) whether the officer was justified in conducting a pat-down search of defendant and in arresting him when a distinct odor

of marijuana was released from his coat pocket during the search.

## I.[1]

In the afternoon of February 28, 2001, Officer James Berling of the Fairfax County Police Department observed defendant driving a car in the parking lot of the Chantilly Public Library. Officer Berling is a school resource officer for Chantilly High School, which is located across the street from the Chantilly Library. Because many Chantilly High School students park their cars in the library parking lot on school days, Officer Berling was there to facilitate the flow of traffic exiting the lot at the end of the school day. Shortly after arriving at the library parking lot at approximately 2:30 p.m., Officer Berling noticed that the traffic exiting the parking lot had stopped. He then drove his patrol cruiser to the entrance of the lot to investigate the cause of the congestion and, in doing so, observed that defendant's vehicle was blocking traffic from exiting the parking lot. At this point, Officer Berling asked defendant what he intended to do, and defendant responded that he intended to back into a parking place, which he proceeded to do. In the course of this encounter, Officer Berling, whose cruiser was facing the front of defendant's 1984 Buick, observed that the Buick had no front license tag; he was not able to see the rear license tag because defendant backed into the parking slot. Officer Berling also noticed that the two rear passenger windows and the rear window on the Buick were very darkly tinted.

After watching defendant park his car in the library parking lot, Officer Berling drove his car to the rear of the library to investigate another matter.[2] Within five minutes, Officer Berling returned to the area of the lot where defendant parked his car and noticed two high school students seated with defendant in the Buick. Aware that Virginia law required a front license tag and prohibited the operation of a motor vehicle with windows tinted beyond a certain degree of opacity, and believing that the absence of a front tag on the Buick and the tinting on the car's windows violated these prohibitions,[3] Officer Berling decided to conduct a traffic stop of defendant. He maneuvered his cruiser directly in front of the Buick, blocking it in the parking space. Officer Berling then approached defendant's car on foot and asked for defendant's license and registration. As defendant retrieved his license and registration, a pit bull terrier began to bark and growl menacingly at Officer Berling from the rear passenger compartment of the Buick. After defendant handed the officer the requested documents,[4] Officer Berling conveyed to defendant that, because of the barking dog,

---

1. The facts set forth here pursuant to Rule 12(e), Fed.R.Crim.P., are derived from the testimony of Fairfax County Police Officer James Berling and Fairfax City Narcotics Detective Mark Nachtmony, which testimony was the sole evidence presented in the course of the June 7, 2001 hearing on defendant's motion to suppress.

2. Just prior to his initial encounter with defendant, Officer Berling observed a student he recognized as having been involved in a fight that had occurred behind the library the previous day. Concerned that there might be a repeat performance of this fight, he went to

the rear of the library to check, but found nothing.

3. Officer Berling testified that, in his experience, legally tinted windows allow an observer to see into the interior of a car, but that the Buick's windows were so dark and opaque that he could not see through them at all.

4. The vehicle registration disclosed that the Buick was registered in Pennsylvania, a state that does not require front licence tags. *See* 67 Pa.Code § 47.2.

he felt uncomfortable conducting the stop with defendant in the car. Accordingly, Officer Berling directed defendant to step out of the car. Defendant, who, in Officer Berling's view, began to appear very nervous, initially expressed reluctance to exit his car and explained to the officer that, despite the barking and growling, the dog was friendly. Officer Berling was not persuaded and repeated his request that defendant exit the vehicle. Defendant ultimately complied, and also agreed to close the driver's side window to prevent the dog from further interfering with the encounter.

As defendant stepped out of his car, Officer Berling noted that, although the weather was unseasonably warm, defendant wore bulky, layered clothing, including a heavy flannel coat with obviously bulging pockets. He also noted that defendant appeared nervous, his eyes darting back and forth, and that defendant had started to pace about anxiously. Defendant's nervous behavior prompted the officer to ask defendant if he had any weapons, which defendant denied. The officer then asked defendant if he could perform a pat-down search, but defendant refused, denying that the officer had any right to conduct a pat-down and demanding to speak with Officer Berling's supervisor. Officer Berling again noticed defendant's nervous behavior and asked defendant if he intended to run. Defendant replied that he just wanted to speak with the officer's supervisor. At this point, Officer Berling called for a backup police officer to assist him in conducting the stop.

When the backup police officer arrived shortly thereafter, Officer Berling conduct-

ed a pat-down search of defendant. As Officer Berling ran his hands along defendant's waistband, he felt a large, compact object contained in a plastic bag in one of defendant's pockets that, when felt during the course of the protective search and without further manipulation, emitted an odor that Officer Berling recognized at once as that of marijuana.[5] He then placed defendant under arrest and retrieved the object from defendant's pocket. It was, on closer inspection, a one-pound "brick" of marijuana. Officer Berling then continued the pat-down search and recovered, *inter alia*, additional, separately packaged marijuana and a knife. Following the pat-down search, defendant was placed in Officer Berling's cruiser for transport to the police station.

Detective Martin Nachtman arrived at the library parking lot shortly thereafter to drive the Buick to the police station. Prior to doing so, he searched the area immediately surrounding the driver's seat as a safety precaution and found no contraband. When Detective Nachtman arrived at the police station, he and another detective conducted an inventory search of defendant's car, pursuant to department procedures. This inventory search disclosed that the Buick's trunk contained, *inter alia*, plastic packaging material, ziploc bags, film canister containers, a scale, a red jacket that contained another marijuana brick in the lining, and an unlocked backpack that contained a sawed-off shotgun with the serial number filed off and some shotgun ammunition.

As a result of the pat-down search and the inventory search incident to the arrest, defendant has been charged with five

---

5. Officer Berling received training in drug identification techniques while enlisted in the United States Coast Guard. Also, as a Fairfax County police officer, Officer Berling attended several schools in narcotics identification and smuggling techniques. Worth noting is that Officer Berling denied having to manipulate the object in any way to determine whether it was marijuana.

counts of possession with intent to distribute marijuana and various firearms offenses.[6] He now moves to suppress all evidence seized pursuant to the traffic stop on the grounds that the officer (i) had no reasonable, articulable suspicion to support the initial traffic stop; (ii) impermissibly expanded the scope of the traffic stop by ordering defendant to exit his car; (iii) conducted an invalid pat-down search of defendant; and (iv) did not have probable cause to arrest defendant after detecting an odor of marijuana in the course of the pat-down search.

## II.

### A. The Traffic Stop

Because a "[t]emporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons'" under the Fourth Amendment, automobile stops must be reasonable under the circumstances in which they occur. *Whren v. United States,* 517 U.S. 806, 809, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); *see also Delaware v. Prouse,* 440 U.S. 648, 653, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979). To pass muster under the Fourth Amendment, an automobile stop must be "justified by probable cause or a reasonable suspicion, based on specific and articulable facts, of unlawful conduct."[7] As one court put it, "a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring."[8]

■ These principles, applied to the totality of the circumstances in this case, compel the conclusion that Officer Berling had an objectively reasonable suspicion based on specific and articulable facts that defendant had violated or was violating Virginia law. Specifically, the officer had an objectively reasonable suspicion based on his observation of the Buick that its rear and side windows violated Virginia Code Section 46.2–1052, which makes it unlawful for any person "to operate any motor vehicle on a highway with ... colored or tinted film ... on .. [the] rear side mirrors, or rear windows of such motor vehicle," if the tinting film "reduce[s] the total light transmittance of such window to less than thirty-five percent."[9] At the suppression hearing, the officer testi-

---

6. *See* 18 U.S.C. §§ 924(c), 922(q)(2), 922(k); 21 U.S.C. § 841(a)(1), (b)(1)(D); 26 U.S.C. § 5861(d).

7. *United States v. Hassan El,* 5 F.3d 726, 729 (4th Cir.1993); *see also Berkemer v. McCarty,* 468 U.S. 420, 439, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (noting that traffic stops are ordinarily regarded as investigative detentions and not custodial arrests for constitutional purposes); *Terry v. Ohio,* 392 U.S. 1, 30, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

8. *United States v. Castillo,* 76 F.3d 1114, 1117 (10th Cir.1996); *see also Kolender v. Lawson,* 461 U.S. 352, 366, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983) ("[U]nder the Fourth Amendment, police officers with reasonable suspicion that an individual has committed or is about to commit a crime may detain that individual, using some force if necessary, for the purpose of asking investigative questions.").

9. The government necessarily conceded at the suppression hearing that the absence of a front license tag could not serve as a basis for the stop, given that Virginia law permits nonresidents to operate motor vehicles registered in other states with no front license tag where the state of registration, as here, does not require such tags. *See* Virginia Code § 46.2–656; *Cf. United States v. Wilson,* 205 F.3d 720 (4th Cir.2000) (en banc) (traffic stop invalid where officer stopped vehicle solely because of an inability to read the expiration date of temporary license tags). *But see State v. Holloway,* No. 96–CA–51, 1997 WL 7132, at *2 (Ohio Ct.App. Jan.10 1997) (traffic stop is valid where it was solely based on officer's

fied that based on his experience, car windows tinted within the limits prescribed by Virginia law allow observers located outside the vehicle to see into the passenger compartment. In this instance, however, Officer Berling testified that the rear windows on defendant's car were "blackened out" and did not permit him to see through these windows at all. Based on these facts, and "crediting the practical experience of officers who observe on a daily basis what transpires on the street," the officer clearly had an objectively reasonable suspicion that the tinting on the rear windows of defendant's car was in violation of Virginia law.[10] Indeed, a subsequent test of the windows confirmed that they did not conform to Section 46.2–1052, as the total light transmittance was no more than three percent, far beyond the allowable thirty-five percent. This objective confirmation of the officer's suspicion establishes conclusively that the initial stop of defendant did not run afoul of the Fourth Amendment.[11]

■ Seeking to avoid this conclusion, defendant makes two arguments. First, defendant argues that Section 46.2–1052, which applies only to vehicles operated "on the highways of the Commonwealth," was plainly inapplicable because defendant was observed driving his car only in the library parking lot, not on a "highway." This argument is unpersuasive. Virginia broadly defines its "highways" as including, *inter alia*, "the entire width between the boundary lines of every way or place open to the use of the public for purposes of vehicular travel in the Commonwealth, including the streets and alleys." Va.Code § 46.2–100. The library parking lot fits comfortably within this definition; it is a "way" or "place" that is "open to the use of the public," i.e., public library patrons, for purposes of vehicular traffic at all times. Indeed, the record reflects that although there are some enforced parking restrictions, the lot is open at all times to allow library patrons to return books to a book depository that is open 24 hours a day.[12] In short, the parking lot is clearly "open to the use of the public for purposes of vehicular travel." *Id.*

■ Moreover, defendant cites no controlling Virginia authority for the proposition that Virginia's traffic and vehicular equipment laws do not apply to public parking lots. Instead, defendant cites to *Flinchum v. Commonwealth*, 24 Va.App. 734, 485 S.E.2d 630, 631 (1997), which held that a parking lot owned and maintained by a sporting goods store was not a "high-

observation that defendant's car did not have front license tags). To allow the traffic stop on this basis "would permit the police to make a random, suspicionless stop of any car" with no front license tag. *Wilson*, 205 F.3d at 724.

10. *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993); *see also United States v. Wallace*, 213 F.3d 1216, 1220 (9th Cir.2000) ("We don't call upon the officers to be scientists or carry ... burdensome equipment to measure light transmittance .... If an officer forms an opinion [based on] common sense, [that is] sufficient to support a conviction.").

11. *See Lewis v. Commonwealth*, 1997 WL 260581, at *1 (Va.Ct.App. May 20, 1997) (af-

firming trial court's finding of reasonable articulable suspicion that tinted windows were in violation of Section 46.2–1052, as objective testing of the windows disclosed that the window tinting was close to legal limitation); *Wallace*, 213 F.3d at 1220 (noting that the subsequent measurement of opacity corroborates a police officer's observations).

12. Accordingly, defendant's argument that the use of the parking lot is putatively limited to library patron parking during library hours or permit parking when the library is closed does not alter the essential fact that the lot in fact is accessible to the public at all times of the day.

way" within the statutory meaning. Yet, it is clear that *Flinchum* and related decisions of the Supreme Court of Virginia establish only the circumstances under which *privately owned* property are deemed "highways."[13] Such an inquiry is necessary when private property is at issue because of the well-settled principle that " 'governmental regulations with respect to the operation of motor vehicles ordinarily are applicable only to operation on public streets and highways, and do not apply to operation on private premises, including operation on a private driveway or a private road.' " *Parker v. DeBose,* 206 Va. 220, 142 S.E.2d 510, 512 (1965) (quoting 60 C.J.S. Motor Vehicles, § 349, pp. 815–16). But where the owners of private property allow the public to use their property for purposes of vehicular travel, the state's interest in ensuring the traveling public's safety warrants the application of governmental regulations with respect to the operation of motor vehicles on such

property. Thus, the Supreme Court of Virginia held in *Furman v. Call,* 234 Va. 437, 362 S.E.2d 709, 710–11 (1987), that "the test for determining whether a way is a 'highway' depends upon the degree to which the way is open to public use for vehicular traffic," and that, in this regard, a condominium parking lot that was accessible to the public at all times of the day was a "highway" under the statutory definition. Where public property is at issue, however, no competing private interests exist to outweigh the state's interest in ensuring the traveling public's safety, and the *Furman* test's inquiry into the degree of public access is therefore irrelevant.[14]

■ Furthermore, assuming, *arguendo,* that a public library parking lot open to the public at all times is not a "highway" within the statute, the stop was nonetheless valid because Officer Berling clearly had a reasonable, articulable suspicion that

---

**13.** *See, e.g., Kay Management v. Creason,* 220 Va. 820, 263 S.E.2d 394, 401 (1980) (holding that "evidence of accessibility to the public for free and unrestricted use [gives] rise to a prima facie presumption" that privately owned property is a "highway" for law enforcement purposes); *Parker v. Debose,* 206 Va. 220, 142 S.E.2d 510, 512 (1965) (noting that "governmental regulations with respect to the operation of motor vehicles ordinarily are applicable only to operation on *public streets and highways,* and do not apply to operation on *private premises,* including operation on a private driveway or a private road") (emphasis added).

**14.** Indeed, the only case addressing the question whether publicly maintained parking lots in counties, cities, and towns are "highways" within the statutory definition is a state trial court that did not employ the *Furman* public-use test. *See Town of Vienna v. McIntyre,* Criminal No. 82979, 1993 WL 946385, at *2 (Va. Cir. Ct. Dec.22, 1993). In *McIntyre,* the trial court found that the alteration of the previous definition of "highway," which encompassed "[t]he entire width between the boundary lines of every way or place of whatever nature open to the use of the public for purposes of vehicular travel in this Commonwealth, including the streets, alleys and publicly maintained parking lots in counties, cities and towns," to eliminate the phrase "publicly maintained parking lots in counties, cities and towns," and the application of the interpretive canon *expressio unius est exclusio alterius* compelled the conclusion that "publicly maintained parking lots in counties, cities and towns" are excluded from the definition of "highway." *Id.* at *2. Yet, the elimination of the phrase "publicly maintained parking lots in counties, cities and towns" may just as easily be interpreted as the elimination of a redundancy in the statutory text, given the statute's broad definition of "highway." Moreover, where, as here, "the language of a statute is plain and unambiguous, [courts] are bound by the plain meaning of that language," and "must determine the intent of the General Assembly from the words contained in the statute, unless a literal construction of the statute would yield an absurd result." *Shelor Motor Co., Inc. v. Miller,* 544 S.E.2d 345, 348 (Va. 2001).

defendant had driven his car on a "highway of this Commonwealth" just minutes before entering the Chantilly Public Library parking lot and that he would have to do so again to depart the parking lot.[15] To ignore this circumstance as justifying the traffic stop in this case would lead to the anomalous result that an officer who observed a vehicle operating in an unsafe manner or condition in a public parking lot could not stop the vehicle until it entered the road. In other words, the purposes of an investigatory stop would be frustrated because officers would be prohibited from making such a stop to prevent potential dangers from materializing. In sum, the totality of the circumstances reasonably support Officer Berling's articulable suspicion that defendant had violated, or was about to violate, Virginia's prohibition on the operation of a motor vehicle with illegally tinted windows on the state's highways.[16] As such, the investigatory stop conducted by Officer Berling met the requirements of the Fourth Amendment. *See Kolender v. Lawson*, 461 U.S. 352, 366, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *United States v. Castillo*, 76 F.3d 1114, 1117 (10th Cir.1996).

■ No more persuasive is defendant's second argument—namely, that because defendant was driving a 1984 Buick, and because car windows tinted prior to July 1, 1987 are "grandfathered in" under Section 46.2–1052, the mere *possibility* that the tinting on defendant's windows may be exempt from the requirements of the Section precludes a "finding that Officer Berling had an objectively reasonable basis for the traffic stop. The flaw in this argument is that Section 46.2–1052 places the burden on individuals claiming an exemption from Virginia's tinting regulations to prove, "by appropriate receipts," the application of tinting film to the windows at issue before July 1, 1987.[17] Thus, the fact that a vehicle operator may prove, after the stop, that the windows on his vehicle fit under the statute's grandfather clause does not alter the fact that, prior to the stop, an officer had a reasonable, articulable suspicion that the windows were tinted in violation of Section 46.2–1052. To hold otherwise would effectively immunize *all* pre–1987 vehicles from investigatory stops by police on the basis of window-tinting, and thereby read out of Section 46.2–1052 the requirement that it is the motor vehicle operator's burden to show that the tinting on his vehicle's windows was installed prior to July 1, 1987.[18]

Accordingly, because Officer Berling had a reasonable, articulable suspicion that the tinting on defendant's car windows was

---

**15.** There is no dispute that the public road separating Chantilly High School and Chantilly Public Library is the usual route by which one gains access to the library parking lot. In addition, Officer Berling testified that he first encountered defendant in his car, with the car's engine running, and expressing an intent to park in the parking lot.

**16.** *See, e.g., United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir.1989) ("The presence or absence of reasonable suspicion must be determined in light of the totality of the circumstances confronting a police officer including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect.").

**17.** Section 46.2–1052 provides that

> sun-shading material which was applied or installed prior to July 1, 1987, in a manner and on which windows not then in violation of Virginia law, shall continue to be lawful, provided that it can be shown by appropriate receipts that such material was installed prior to July 1, 1987.

Va.Code § 46.2–1052(I).

**18.** It is worth noting that defendant has not produced receipts demonstrating that the tinting on the windows of his car was applied before July 1, 1987.

in violation of Section 46.2–1052, defendant's suppression motion must be denied on this ground.

### B. Direction to Exit the Vehicle

Defendant also argues that, even were the initial stop and seizure lawful, Officer Berling, by requiring defendant to exit his vehicle after receiving defendant's license and registration, expanded the scope of the traffic stop beyond what was permitted by the Fourth Amendment. In this respect, defendant relies on *Florida v. Royer*, 460 U.S. 491, 499, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983), where the Supreme Court held that "an investigative detention must be temporary and no longer than is necessary to effectuate the purpose of the stop," and that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." In defendant's view, once he gave Officer Berling his driver's license and registration, the officer should have simply issued defendant a ticket for illegally tinted windows and sent him on his way.

 This argument founders on the settled principle that "[o]nce a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." *Pennsylvania v. Mimms*, 434 U.S. 106, 111 n. 6, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977); *United States v. Taylor*, 857 F.2d 210, 214 (4th Cir.1988) ("Once a lawful *Terry* stop of an automobile is made, ordering suspects from the vehicle is a valid precautionary measure designed to afford a degree of protection to the investigating officer."). This is so because "the incremental intrusion resulting from the request to get out of the car once the vehicle was lawfully stopped," when

weighed against legitimate concerns over the officer's safety, "can only be described as *de minimis*." *Mimms*, 434 U.S. at 108–11, 98 S.Ct. at 332–33. Here, Officer Berling, having lawfully stopped defendant for violating Virginia's window-tinting law, was clearly entitled to order defendant to exit his vehicle, especially given his reasonable reluctance to continue the traffic stop while a pit bull terrier was barking and snarling at him from the rear passenger compartment. In short, Officer Berling's direction to defendant to exit the car "hardly rises to the level of a petty indignity" and thus did not unreasonably expand the scope of defendant's initial stop and seizure. *Id.* at 333, 98 S.Ct. 597 (quotation omitted).

### C. Pat–Down Search and Arrest

Defendant's third and final ground for suppression is his claim that even were the initial stop and seizure and Officer Berling's order for defendant to exit his car lawful under the Fourth Amendment, the subsequent pat-down and arrest of defendant were unconstitutional. Disposition of this claim is controlled by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and its progeny.

 In *Terry*, the Supreme Court noted that

[w]hen an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others, it would appear to be clearly unreasonable to deny the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.

*Id.* at 24, 88 S.Ct. 1868. In such circumstances, the Supreme Court held, the officer may conduct a pat-down search "to determine whether the person is in fact

carrying a weapon." *Id.* at 24, 88 S.Ct. 1868. Such a protective search must be strictly "limited to that which is necessary for the discovery of weapons which might be used to harm the officers or others nearby." *Id.* at 26, 88 S.Ct. 1868. However, if the protective search for weapons of the suspect's outer clothing immediately reveals to the officer the incriminating nature of other contraband, the warrantless seizure of the item by the officer would be justified under the Fourth Amendment. *See, e.g., Minnesota v. Dickerson,* 508 U.S. 366, 375–76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); *United States v. Hines,* 943 F.2d 348, (4th Cir.1991) (holding that the seizure of a bullet discovered during a pat-down search of the defendant's pockets was valid).

■■■ These principles, applied to the circumstances of this case, persuasively point to the conclusion that Officer Berling's pat-down search for weapons of defendant's outer clothing was valid under the Fourth Amendment. Pertinent here is Officer Berling's testimony that, after exiting the Buick, defendant appeared nervous and agitated and that he paced back and forth. Importantly, Officer Berling also testified that, despite the unseasonably warm weather that day, defendant wore bulky, layered clothing, including a flannel coat with bulging pockets. These observations, coupled with the presence of the menacing dog, clearly made it reasonable for the officer to conduct a limited search for weapons for his safety and the safety of those nearby. *See, e.g., Hines,* 943 F.2d at 352 ("Having stopped [a defendant] who was wearing a heavy jacket, [the officer] was permitted to make a brief pat down to insure that he was not confronting an armed man."); *United States v. Villanueva,* 15 F.3d 197, 197–98 (1st Cir.1994) (holding that the pat-down frisk of defendant, who "looked 'extremely nervous'" and wore "a goosedown type of coat hanging past his knees that could conceal a weapon" was reasonable).

■■■ It is also clear that defendant's arrest immediately after Officer Berling recognized the odor of marijuana emanating from defendant's coat pocket was supported by probable cause. Officer Berling testified that when he pressed his hands on defendant's pockets during his search for weapons, a compact object in a plastic bag in one of the pockets emitted an odor that, because of his extensive narcotics interdiction training, the officer instantly recognized as that of marijuana, and that no further manipulation of the object caused this emission. In this regard, the pat-down search of defendant did not exceed the scope permitted in the circumstances by the Fourth Amendment.[19] Moreover, the officer's detection of a distinct odor of marijuana emanating from defendant's jacket, when combined with the officer's tactile detection of a compact object contained in a plastic bag in the jacket pocket and the other circumstances surrounding the traffic stop, gave the officer probable cause to arrest defendant.[20]

---

**19.** *See Dickerson,* 508 U.S. at 375–76, 113 S.Ct. 2130; *cf. United States v. Haley,* 669 F.2d 201, 203–04 n. 3 (4th Cir.1982) (finding warrantless seizure valid when officer stopped vehicle for a traffic violation and detected a strong odor of marijuana); *United States v. Raymond,* 152 F.3d 309, 313 (4th Cir.1998) (seizure of pie-shaped object, which officer with extensive narcotics detection training immediately recognized as crack cocaine, valid under Fourth Amendment).

**20.** *See e.g., Johnson v. United States,* 333 U.S. 10, 13, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (finding that probable cause may be founded on an officer's detection of the distinct odor of a forbidden substance); *United States v. Haley,* 669 F.2d at 203 (holding that an officer's detection of marijuana odor originating from a vehicle gives rise to sufficient probable cause for a warrantless search); *cf. United States v. Manbeck,* 744 F.2d 360, 376 (4th

Thus, the officer's subsequent seizure of the object from defendant's pocket was a valid search incident to arrest, and no Fourth Amendment violation occurred.[21]

Accordingly, defendant's suppression motion must be denied because Officer Berling (i) had a reasonable, articulable suspicion to conduct a traffic stop, (ii) was warranted in directing defendant to exit his car, (iii) reasonably conducted a pat-down search of defendant's outer clothing, and (iv) had probable cause to arrest defendant after detecting marijuana in defendant's pocket.

An appropriate Order has issued.[22]

Cir.1984) (probable cause arises from "facts and circumstances within the officer's knowledge [that] would warrant the belief of a prudent person that the arrestee had committed or was committing an offense").

21. *See, e.g., Michigan v. DeFillippo,* 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979); *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Because defendant's arrest was valid, so too were the two subsequent searches of defendant's car. First, Detective Nachtman's search of the area immediately around the driver's seat before driving defendant's vehicle from Chantilly Public Library to the police station was warranted as a safety precaution; indeed, this search did not find any contraband in the area searched. Second, the inventory search of defendant's car, through which the searching officers discovered additional contraband, was clearly valid. *See Whren,* 517 U.S. at 811 n. 1, 116 S.Ct. 1769 ("An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage.").

22. Following the denial of defendant's suppression motion for the reasons stated here, defendant pled conditionally to carrying a firearm during and in relation to, and possession in furtherance of, a drug trafficking crime. *See* 18 U.S.C. § 924(c)(1)(A).