**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-4837

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

CHARLES C. WILLIAMSON,

Defendant – Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling. John Preston Bailey, District Judge. (5:18-cr-00022-JPB-JPM-1)

Argued: January 29, 2020                               Decided: March 23, 2020

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Motz joined.

**ARGUED:** David W. Frame, LAW OFFICE OF DAVID W. FRAME, Clarksburg, West Virginia, for Appellant. Robert Hugh McWilliams, Jr., OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee. **ON BRIEF:** William J. Powell, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Wheeling, West Virginia, for Appellee.

WILKINSON, Circuit Judge:

In our criminal justice system, sentences for drug offenses are primarily based on the type and weight of the drug involved. In July 2018, Charles C. Williamson pleaded guilty to one count of aiding-and-abetting the distribution of methamphetamine. At sentencing, when deciding on the quantity of methamphetamine to attribute to Williamson, the district judge counted those drugs that Williamson and his accomplice sold, as well as those that the accomplice used "recreationally." Williamson's claim on appeal is solely that his accomplice's personal use should not have counted. We disagree. And finding no other error with Williamson's sentence, we affirm.

I.

On June 5, 2018, a grand jury for the United States District Court for the Northern District of West Virginia returned a three-count indictment against Williamson. Count one charged him with conspiracy to distribute methamphetamine, heroin, cocaine, and cocaine base in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C). Counts two and three charged Williamson with aiding-and-abetting the distribution of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). The indictment did not specify a drug weight, which meant that Williamson faced a statutorily-prescribed sentencing range of zero to twenty years imprisonment for each count. The grand jury also indicted Brea M. Saeger, who was Williamson's accomplice and on-and-off-girlfriend, for the same three offenses.

On July 16, 2018, without the benefit of a plea agreement, Williamson pleaded guilty to one count of aiding-and-abetting the distribution of methamphetamine. The general nature of this drug trafficking scheme is not at issue. In short, Williamson would

2

receive methamphetamine from a supplier—mostly in crystal form ("Ice"), but sometimes in powder. He would then give at least some of that methamphetamine to Saeger. From there, the two shared roles. Williamson and Saeger were both involved in packaging and distributing a portion of the methamphetamine. The two also recreationally used the other portion of the methamphetamine.

A presentence report was prepared in August 2018. The report calculated the weight of methamphetamine attributable to Williamson from three sources: (i) two controlled buys, (ii) one seizure following a duly-executed search warrant, and (iii) two statements, one from one of Williamson's purported customers, and another from Saeger, who noted how much methamphetamine she received from Williamson over their time together. The vast bulk of the methamphetamine attributed to Williamson in the report was based on Saeger's account. Williamson filed only one objection. He argued that it was legal error to count the drugs he gave to Saeger that she used personally because she was his accomplice, not a customer.

On November 7, 2018, a sentencing hearing was held for Williamson. The government called only one witness: Saeger, who had since pleaded guilty to one count of aiding-and-abetting the distribution of methamphetamine, and had entered a plea agreement with the government in exchange for her cooperation against Williamson. Saeger testified that she received one gram of methamphetamine a day from Williamson from August 2016 to May 2018. Of this, she said, about 90 percent was "Ice" (crystal methamphetamine) while 10 percent was powder methamphetamine. She also testified that they would sell roughly $20 worth of methamphetamine each day, and then would

3

consume the rest of the daily gram recreationally. Saeger did not say how much of this latter amount she used by herself, as compared to how much she used together with Williamson. Williamson did not testify nor did he call any witnesses on his behalf.

The only major open issue at sentencing was the quantity of methamphetamine attributable to Williamson. To determine this, the district judge appeared to rely primarily on Saeger's testimony. The court reasoned that if Saeger received one gram a day from Williamson for at least 21 months (August 2016 to May 2018), that would come to about 630 grams of methamphetamine. The court, however, refined this figure in several ways. First, in light of the fact that one gram of "Ice" is equivalent to ten grams of powder methamphetamine under the Guidelines, the district court focused only on how much "Ice" Williamson gave Saeger. See U.S.S.G. § 2D1.1(c). The district judge noted that Saeger had said that about 90 percent of the methamphetamine she received from Williamson was "Ice," so the court reduced the amount attributable to Williamson to 540 grams of "Ice" (roughly 85 percent of the total methamphetamine). Second, the district judge observed that Saeger had explained that she was intermittently separated from Williamson over the relevant 21-month period, and found it was unlikely that she actually received one gram per day from him without interruption. As such, the district court decided that it was appropriate to set Williamson's base offense level at 32, which corresponds to 150 to 500 grams of "Ice," rather than 34, which is used for 500 to 1,500 grams of the same. *Id.* § 2D1.1(c)(3)-(4). As relevant here, the district judge did not consider how much methamphetamine Williamson or Saeger set aside for "personal use."

4

With the base offense level set, the district court then turned to the other factors under the Guidelines. It added a two level enhancement for obstruction of justice, but then subtracted three levels for acceptance of responsibility, bringing the total offense level to 31. Williamson's criminal history was category II. Williamson does not challenge any of these determinations. Put together, the recommended range under the Guidelines was 121 to 151 months imprisonment. The district court then sentenced Williamson to 121 months, with credit for time served, and 3 years of supervised release. The government dismissed the other two counts from the indictment against Williamson. This timely appeal followed.

## II.

Sentences must be both procedurally and substantively reasonable. See *Gall v. United States*, 552 U.S. 38, 46 (2007). A sentence is not procedurally reasonable if the district court improperly calculated the Guidelines range. *Id.* at 51. Williamson's main claim on appeal is that the district judge did just that by making a legal error—counting the drugs that Williamson gave to his accomplice/girlfriend, Saeger, and that she used personally—which led to a higher recommendation than he should have received. We review a district court's legal conclusions de novo. *United States v. Layton*, 564 F.3d 330, 334 (4th Cir. 2009).

## A.

As noted, punishments for drug offenses in our system are principally determined by the type and weight of drug involved in the criminal activity. Williamson's claim is about when drugs allegedly kept by an accomplice for "personal use" can be included as part of that calculation. To understand this case, it is first necessary to understand the

central role that drug weight plays in defining drug offenses. Specifically, it is essential to appreciate how federal law links the seriousness of a drug offense to the drug quantity at issue and, relatedly, how judges ordinarily determine the weight for which a given defendant is responsible.

Congress has made plain that the seriousness of a drug offense should be tied to the type and quantity of drug involved. In particular, in 1986, Congress passed the Anti-Drug Abuse Act ("ADAA"), which established a "weight-driven scheme" for punishing drug offenses. *Kimbrough v. United States*, 552 U.S. 85, 96 (2007). This scheme has two core parts. First, it created a tiered system of mandatory minimum and enhanced maximum sentences for drug crimes, with a five-year mandatory minimum for "serious" dealers and a ten-year mandatory minimum for "major" ones. *Id.* at 95. Second, Congress decided on "the weight of the drugs involved in the offense as the sole proxy to identify 'major' and 'serious' dealers." *Ibid.* In so many words, the higher the weight, the higher the penalty.

The ADAA's weight-driven scheme was a conscious departure from past practice. Before the ADAA, federal law generally did not impose mandatory minimums on drug offenses, and did not parse drug crimes on the basis of weight. See Pub. L. No. 91-513, 84 Stat. 1236 (Comprehensive Drug Abuse Prevention and Control Act of 1970). But Congress ultimately found this regime ineffective and inadequate. Specifically, Congress took issue with the fact that "the controlled substances law[s] did not distinguish drug traffickers by the quantities of drugs they were responsible for selling and smuggling," leading to a federal enforcement scheme that lacked "focus" and "direction." See H.R. Rep. No. 99-845, at 11 (1986) (House Judiciary Subcommittee on Crime report for a

6

precursor bill to the ADAA). To remedy this defect, the ADAA identified drug quantity as the best metric for evaluating the seriousness of a drug offense. *Id.* at 12. And while Congress has amended how heavily certain types and weights of drugs are punished, *e.g.*, Pub. L. No. 111-220, 124 Stat. 2372 (Fair Sentencing Act of 2010), it has consistently retained the ADAA's weight-driven design.

The Sentencing Guidelines, moreover, follow this design. While federal statutes set the floor and ceiling for a possible sentence, the Guidelines were put in place to assist district judges in selecting an informed point within that range. Critically, while the Sentencing Commission "developed Guidelines sentences using an empirical approach based on data about past sentencing practices" for most crimes, it took a different tack with drug crimes in light of the ADAA. *Kimbrough*, 552 U.S. at 96. Specifically, faithful to Congress's policy judgments, the Commission took the ADAA as a mandate to increase drug sentences above traditional benchmarks and, furthermore, to calibrate sentences to the type and quantity of drug involved in a certain conviction. U.S. Dep't of Justice, An Analysis of Non-violent Drug Offenders With Minimal Criminal Histories 15 (1994) ("[D]rug quantities . . . are the single most important determinant of the drug offender's sentence length."). The most important part of the Guidelines for drug offenses is the Drug Quantity Table, which assigns base offense levels according to these objective metrics, consistent with the ADAA. *Kimbrough*, U.S. at 96-97; see also U.S.S.G. ch. 1, pt. A, § 3 (2000). As above, while the Guidelines have changed features of this Table over time, they have always stuck to a weight-driven approach in their recommendations for drug crimes.

7

At bottom, Congress made a clear policy judgment in the ADAA, and the Guidelines followed suit: the severity of a drug offense must turn on the weight of the drugs involved.

B.

This policy judgment about the central import of drug weight pervades how district judges ordinarily decide the drug quantity attributable to a defendant under the Guidelines. (The terms "weight" and "quantity" are most often used synonymously.)

The applicable Section for violations of 21 U.S.C § 841(a), which is the law that covers Williamson's conviction as well as other drug trafficking offenses, is Section 2D1.1. That Section states that the "base offense level" for a drug offender whose crime does not involve death or serious bodily injury is dictated exclusively by the Drug Quantity Table—the table, mentioned above, that gives a base offense level pegged to the type and quantity of drug at issue. See U.S.S.G. §§ 2D1.1(a)(5), 2D1.1(c); see also *United States v. Gill*, 348 F.3d 147, 151 (6th Cir. 2003). For instance, recall that 150 grams of "Ice" leads to a base offense level of 32.

The amount that is plugged into the Drug Quantity Table is not necessarily the same drug quantity that determines a defendant's statutory minimum and maximum sentence under 21 U.S.C. § 841. Instead, the Guidelines make plain that a court should look to *both* the offense of conviction *and* a defendant's "relevant conduct." U.S.S.G. § 1B1.2(b). Conceptually, of course, "relevant conduct" means a defendant's own behavior generally surrounding the offense of conviction and also, when applicable, the behavior of his accomplices or co-conspirators. See *United States v. Wright*, 873 F.2d 437, 441 (1st Cir. 1989) (Breyer, J.) (noting that "very roughly speaking, [relevant conduct] corresponds to

8

those actions and circumstances that courts typically took into account when sentencing prior to the Guidelines' enactment"); see also *United States v. Carter*, 300 F.3d 415, 425 (4th Cir. 2002) (reiterating that such conduct must only be proven by a preponderance of the evidence). For drug offenses, the Guidelines make clear that "[t]ypes and quantities of drugs not specified in the count of conviction may be considered in determining the offense level," as long as those drugs were part of "relevant conduct" under the Guidelines. See U.S.S.G. § 2D1.1, cmt. n.5.

Williamson claims simply that drugs possessed or consumed for "personal use" by his accomplice fall outside the ambit of relevant conduct here. This court has not decided whether drugs set aside for "personal use" could be included as relevant conduct for a standalone conviction of aiding-and-abetting the distribution of a controlled substance— the only offense to which Williamson pleaded guilty. And it does not seem that any other circuit has done so. But our sister circuits have weighed in on this issue in a closely analogous context.

Every circuit to address the question has held that drugs consumed or possessed for "personal use" may be counted as relevant conduct at sentencing for the crime of conspiring-to-distribute a controlled substance. *United States v. Iglesias*, 535 F.3d 150, 160 (3d Cir. 2008); *United States v. Clark*, 389 F.3d 141, 142 (5th Cir. 2004); *United States v. Page*, 232 F.3d 536, 542 (6th Cir. 2000); *United States v. Asch*, 207 F.3d 1238, 1243-44 (10th Cir. 2000); *United States v. Stone*, 139 F.3d 822, 826 (11th Cir. 1998); *United States v. Fregoso*, 60 F.3d 1314, 1328-29 (8th Cir. 1995); *United States v. Snook*, 60 F.3d 394, 396 (7th Cir. 1995); *United States v. Innamorati*, 996 F.2d 456, 492 (1st Cir. 1993). These

9

circuits, at heart, have reasoned that what generally matters under the Guidelines in the context of a conspiracy is the total quantity of drugs involved in the entire enterprise, not what individual co-conspirators choose to do with those drugs. As Judge Posner put it:

> Suppose that X sells Y a kilogram of cocaine in circumstances that make Y a conspirator with X and not merely a buyer from him. The amount of drugs involved in the conspiracy is unaffected by the use that Y makes of the drugs. It makes no difference whether he sells the entire amount and buys drugs for his personal consumption on the open market with the proceeds or keeps a portion of the drugs to consume personally as compensation for his participation in the conspiracy.

*United States v. Wyss*, 147 F.3d 631, 632 (7th Cir. 1998); see also *Innamorati*, 996 F.2d at 492 ("[T]he defendant's purchases for personal use are relevant in determining the quantity of drugs that the defendant knew were distributed by the conspiracy."). This makes sense: when sentencing people who were part of different conspiracies but were convicted under the same statute, the Guidelines treat members of more serious conspiracies more seriously, and the seriousness of a drug conspiracy, as noted, corresponds to the drug weight at issue. We therefore agree with the overwhelming consensus of our sister circuits that drugs consumed or possessed for personal use may be considered as relevant conduct at sentencing for a conspiracy-to-distribute conviction.[*]

## C.

Williamson insists, however, that drugs set aside for an accomplice's "personal use" may not be included as relevant conduct for the crime of aiding-and-abetting the

---

[*] We express no thoughts, however, on the relevance of a defendant's own "personal use," where such drugs were not obtained in connection with jointly undertaken criminal activity. That question was simply not raised in this appeal.

10

distribution of a controlled substance. In particular, he argues that he should not be on the hook for the drugs that he distributed to Saeger for her "personal use" because "drug quantities consumed by personal use of an accomplice are not within the scope of the jointly undertaken criminal activity." App. Br. at 15. For this reason, Williamson says, those drugs used personally by Saeger should not have counted at sentencing since "[r]elevant conduct should extend no further than the drug quantity involved in the offense of conviction," *id.* at 14, and her personal use was not part of the offense of conviction's distributional scheme.

Williamson's argument fails for multiple reasons. Initially, his notion of a "personal use" exception for an accomplice is nowhere in the text of the Guidelines. See U.S.S.G. § 2D1.1. Tellingly, the Guidelines have a number of sections that instruct district courts to reduce a defendant's base offense level when doing so would better account for his culpability. For instance, Section 3B1.2 directs judges to lower a defendant's offense level if he was a "minimal" or "minor" participant in the criminal enterprise. But there is nothing in the text of the Guidelines that even glancingly can be taken as something similar to the sort of "personal use" exception that Williamson champions before us.

The absence of such a "personal use" by accomplice exception is not surprising because its underlying premise intuitively cuts against the entire weight-based scheme for punishing drug offenses described above. The touchstone for the severity of drug offenses, as we have noted, is the *weight* of the drugs involved in the criminal activity. The exception offered by Williamson here is not simply atextual—rather, it is in the teeth of how the Guidelines account for this weight-driven scheme through relevant conduct. Indeed, as

11

Section 1B1.3(a)(1)—the provision that is most directly applicable to a case like this, see, *e.g.*, *Gill*, 348 F.3d at 153—makes plain, relevant conduct covers a defendant's actions "that *occurred* during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1) (emphasis added). Nothing about this concept suggests that conduct that is otherwise relevant suddenly becomes irrelevant if the unlawful substances with which the defendant is associated are assertedly for the "personal use" of an accomplice.

Williamson argues for a particularly problematic application of this atextual concept. He has pleaded guilty to a distributional offense, not one of simple possession, and he makes no bones about having *distributed* to Saeger the "Ice" at issue here. Instead, he is averring on appeal that Saeger's personal use should be treated as his own because she was his accomplice in the matter. But this misses the mark. To put it plainly, distribution is the very anthesis of "personal use," and what a recipient decides to *do* with drugs given to her by a distributor has no bearing on the quantity of drugs she *received* from the distributor in the first place.

It is apparent too that Williamson's foundational proposition—that he, in short, should be treated as one with Saeger—falters for yet a further reason. As noted, every circuit to reach the issue has held that drugs possessed or consumed for "personal use" may be included as relevant conduct for conspiracy-to-distribute convictions. And while conspiracies might appear to present the least defensible case for application of any "personal use" exception, the animating rationale behind those decisions is certainly

12

applicable in the context of aiding-and-abetting, conspiracy's close kin.  Consistent with traditional maxims of conspiracy law, *Callanan v. United States*, 364 U.S. 587, 593 (1961), our sister circuits have recognized that collective criminal activity poses an especially acute danger to civil society.  As such, when interpreting the Guidelines in the context of joint criminal activity, these courts have rightly focused on the scope of the entire criminal enterprise; that is, generally speaking, the total amount of drugs in circulation that a defendant was aware of or were reasonably foreseeable.  See *United States v. Bell*, 667 F.3d 431, 442 (4th Cir. 2011) (approvingly citing germane case law from other circuits).

So much so here.  Aiding-and-abetting the distribution of a controlled substance is also an inherently collective enterprise, one that must go beyond a mere buyer-seller transaction.  See *United States v. Colon*, 549 F.3d 565, 571 (7th Cir. 2008).  And as the scope of the endeavor grows, so does its seriousness.  This is true no matter how the accomplice's drugs are specifically allocated.  In fact, to exclude an accomplice's "personal use" quantities in this context would be to ignore the reality that "personal use" consumption often drives the expansion of criminal schemes, because the more someone uses, the more likely she will need to sell to afford her budding addiction (thereby growing the enterprise even more).  See *Snook*, 60 F.3d at 396 (noting "the more [the defendant] used, the more he had to sell to bank-roll his habit").  For these reasons, Williamson is dead wrong to say that the "personal use" of his accomplice should not count.  By contrast, when evaluating the seriousness of a joint criminal activity like aiding-and-abetting, it stands to reason that the total amount of apparent or foreseeable drugs in circulation, however used by his accomplice, is of the highest import.  See, *e.g.*, *Innamorati*, 996 F.2d at 492.

13

If this were not enough, the practical dynamics of sentencing militate against embracing Williamson's proposed "personal use" exception. It is not difficult to foresee that recognizing such an exception would prompt many a drug offender to claim at sentencing that whatever drugs were found in his accomplice's possession or ambit were intended for "personal use." But we are not inclined to burden district judges with such an indeterminate inquiry. The line separating "personal use" from "non-personal use" is inherently fluid, fluctuating based on a drug offender's cash needs, daily desires, or "professional" obligations. What might be set aside for "personal use" one day, may need to be distributed or sold the next. Forcing the district court to parse such shifting aspirations would be inordinately difficult where the accomplice may not even be available to testify at sentencing.

Taken for what it is, Williamson's proposed exception is quite unsound. It portends little more than an erosion of the weight-based scheme created by Congress for punishing drug offenses. For the above reasons, we decline to pursue that path, and hold that drugs distributed for the "personal use" of an accomplice may be included as relevant conduct for the crime of aiding-and-abetting the distribution of a controlled substance. The district court thus did not err when it included such quantities in sentencing Williamson.

III.

Williamson raises a second objection to his sentence. Aside from any potential legal error, he argues, the district court nonetheless abused its discretion by basing its analysis so heavily on Saeger's testimony. This because, Williamson maintains, Saeger was not credible and the government did not offer any corroborating proof for her shaky claims.

14

We have little trouble rejecting this contention. "We review the district court's calculation of the quantity of drugs attributable to a defendant for sentencing purposes for clear error." *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999). In so doing, we afford "great deference" to a district judge's credibility determinations and how the court may choose to weigh the evidence. See *United States v. Henry*, 673 F.3d 285, 292 (4th Cir. 2012).

The district court did not commit clear error in its sentencing analysis. Under the Guidelines, "[w]here there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance." U.S.S.G. § 2D1.1 cmt., n.5. District courts enjoy considerable leeway in crafting this estimate. Indeed, the court may "give weight to any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy." *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010).

Relying on Saeger's testimony and the presentence report, the district court made a reasonable decision. For one, every issue raised here regarding Saeger's credibility was explored on cross-examination. Moreover, the district court did not draw some slapdash drug quantity from Saeger's testimony. Rather, as explained above, the district judge reduced the possible weight attributable to Williamson at least twice over in a careful manner: first, by focusing only on the percentage of "Ice," and second, by accounting for Williamson and Saeger's time apart. At the end of the day, while Saeger's testimony could have supported an approximation of at least 540 grams of "Ice," which would have

15

corresponded to a base offense level of 34, the district court erred on the side of caution and selected a base offense level of 32 that corresponded to only 150 to 500 grams of "Ice." This approach faithfully adheres to our precedents. See *Bell*, 667 F.3d at 441. In so many words, the district court did not err at all here, let alone do so clearly.

IV.

Our holding in this matter follows from the plain text of the Guidelines, and the congressional policy judgments incorporated therein. It need not, however, augur a draconian sentencing regime. District courts must still exercise caution in estimating drug quantity at sentencing, and not attribute speculative or scantily supported amounts to defendants. See *United States v. Cook*, 76 F.3d 596, 604 (4th Cir. 1996). Likewise, those sentencing ranges compelled by federal statute still turn on the drug quantity involved in the offense of conviction, and defendants involved with smaller drug weights will face lesser sentences.

If this remains cold comfort for some, their pleas should be directed to Congress or the Sentencing Commission. While federal judges possess discretion in sentencing, that discretion does not amount to a form of legislative power in disguise. Our sole function is to apply the law as written. Accordingly, the judgment of the district court is

*AFFIRMED*.