**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-4380**

UNITED STATES OF AMERICA,

Plaintiff − Appellee,

v.

ROBERT MICHAEL JUNKINS,

Defendant – Appellant.

Appeal from the United States District Court for the Northern District of West Virginia, at Elkins.  John Preston Bailey, District Judge.  (2:18−cr−00030−JPB−MJA−1)

Submitted:  May 21, 2021                     Decided:  August 13, 2021

Before DIAZ, MOTZ, and RUSHING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

Scott C. Brown, SCOTT C. BROWN LAW OFFICE, Wheeling, West Virginia, for Appellant.  Randolph J. Bernard, Acting United States Attorney, Wheeling, West Virginia, Brandon S. Flower, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Clarksburg, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Robert Junkins was arrested, convicted, and sentenced for drug-related crimes in West Virginia. This appeal arises from the district court's denial of Junkins's motion to suppress evidence collected during two traffic stops, which he claims were unlawful. Junkins also challenges his sentence, claiming that the district court erred in calculating his converted drug weight. We reject these arguments and affirm the district court's judgment.

I.

A.

On August 1, 2017, officers Jason Carlson and Lee Goad received a call requesting a welfare check on two people in a red Mustang parked at a restaurant. They'd been unconscious for a spell but then got up and began taking pictures of themselves and other people. The officers arrived in time to watch the Mustang pull onto a public road, so they followed it to check on the driver. While trailing after the Mustang, the officers saw what looked like a straw fly out of the passenger window and observed that the car's license plate was obstructed. They then initiated a traffic stop.

Carlson approached the driver, Junkins, informed him of the nature of the stop, and asked for his license, registration, and proof of insurance. Junkins was agitated and belligerent, but handed over his license and a receipt that showed he had traded another car for the Mustang. Junkins didn't have proof of insurance, but Carlson allowed him to call his wife, who Junkins claimed could text him a picture of the insurance card. While Junkins

2

was trying to contact his wife, Carlson ran the Mustang's registration and, after some trouble, confirmed it was valid.

Carlson returned to the Mustang and informed Junkins of the initial welfare complaint. Junkins again became belligerent and uncooperative. Junkins didn't answer when Carlson asked if there was anything in the Mustang he should be worried about and if he could search the car. At this point, Carlson requested a canine unit, which had to complete a stop nearby before it could report to the scene.

"[A] couple minutes" later, Junkins received a picture of the insurance card from his wife. J.A. 122. But the insurance card was for a different vehicle, so Carlson called the insurance company to verify that the Mustang was insured under the same policy. During what was a "lengthy telephone call" with the insurance company, the canine unit arrived at the scene. J.A. 125. While the dog was sniffing the car for drugs, Carlson received verification that the Mustang was insured. Carlson was still in his vehicle writing citations for obstructed registration and littering when the dog alerted to the driver's side door.[1] The officers then searched the Mustang and found narcotics, a gun, and drug

---

[1] Officer Goad wrote the initial report of the incident, which could be read to suggest that Carlson had verified the Mustang's insurance coverage before the canine unit arrived. But when he testified, Goad recalled that the dog sniff took place at about the same time that the officers received insurance verification and while Carlson was writing the citations.

3

paraphernalia.[2]  On direct examination, Carlson confirmed that he "[did] everything [he] could to speed things along" during the traffic stop.  J.A. 131.

More than a year later, on November 30, 2018, officers Daniel Sayre and Ryan Summerfield noticed a black Mercury parked in front of a convenience store with its engine running and expired registration tags.  The only entrance and exit to the store parking lot connected to a public roadway.  The officers ran the license plate number and confirmed with dispatch that the tags were expired.  The officers then initiated a traffic stop.

As the officers approached the Mercury, they saw its occupants making furtive movements "towards the front of themselves, around the floorboards of the vehicle."  J.A. 302.  Sayre asked the driver, Junkins, for identification, but he couldn't find it after erratically searching.  Because "he appeared to be nervous," Sayre asked Junkins to step out of the car.  J.A. 303.  Junkins complied, and Sayre saw drug paraphernalia on the floorboard as the car door opened.

Following a scuffle, the officers detained Junkins and his passenger, and then they searched the car.  They found a gun, drug paraphernalia, and a small amount of meth.  In an interview at the police station following the search and arrest, Junkins made incriminating statements about there being some meth in his car, owning the gun, and his "involvement in the drug trade."  J.A. 290.

---

[2] Junkins also spoke with federal agents who arrived at the scene after the dog alerted.  He admitted that the drugs, gun, and other paraphernalia found in the car were his, but was not immediately arrested.

B.

A grand jury indicted Junkins on seven counts: counts one, four, and six charged Junkins with possession with intent to distribute meth in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C); count two charged him with possession of a gun during and in relation to a drug offense in violation of 18 U.S.C. § 924(c)(1)(A)(i); and counts three, five, and seven charged him with unlawful possession of a gun in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Junkins moved to suppress the evidence seized during the November 30 traffic stop (which led to counts one, two, and three) and the August 1 traffic stop (which led to counts four and five), claiming that it was obtained "through illegal searches and subsequent questioning." J.A. 20. The district court denied the motion, concluding that both traffic stops were lawful. Junkins also moved to suppress evidence found during a search of his home (which led to counts six and seven), but the court eventually dismissed these counts on the government's motion.

After a two-day trial, a jury found Junkins guilty of the remaining five counts.

C.

At sentencing, the government called a cooperating defendant ("CD") as a witness.[3] CD is a drug addict and felon who agreed to cooperate with the government as part of a plea agreement. CD had known Junkins "[s]ince 2003, 2002" and called him his "brother." J.A. 657.

---

[3] Because the government's briefs refer to the witness as "CD," we do the same.

CD testified that Junkins gave him meth for free, "as a brother-to-brother thing. . . . Whenever [he] asked [Junkins] for" it. J.A. 663. CD also testified that although he couldn't "say that [Junkins] ever sold [him] any drugs," he gave Junkins some money when he could. *Id.* CD received an eighth of an ounce of meth from Junkins every other day for "[a]t least two months." J.A. 675. This quantity increased to a quarter ounce after two months and, all in all, Junkins gave CD drugs for "[a] good year, year and a half." J.A. 664. CD testified that he once saw "a piece of meth as big as your arm" in Junkins's bedroom, which "was a pound itself, easily." J.A. 667, 673. CD also recalled two instances during which he accompanied Junkins on drug deliveries. CD estimated the quantity of one such delivery was "close to a kilo." J.A. 670.

After CD testified, the district court continued the hearing so that it could examine the effect of a recent Supreme Court ruling in *Rehaif v. United States*, 139 S.Ct. 2191 (2019) on the gun charges. The court ultimately dismissed counts three and five on the government's motion.

At the continued sentencing hearing, the court calculated Junkins's drug weight by relying on CD's testimony (and the testimony of one other witness) and accounting for the drugs seized in the traffic stops. The court attributed 54,127 kilograms of converted drug weight to Junkins, significantly less than the 83,344 kilograms that the probation office attributed to him in the presentence report.[4] The court calculated Junkins's base offense

---

[4] Though the district court found that "Ice" methamphetamine made up the vast majority of the drugs in this case, officers also found a small amount of heroin following the August 1 traffic stop. When a drug case contains different controlled substances, courts

level to be 36 as to counts one and four. The court also "added two levels for maintaining a drug-involved premises," bringing Junkins's total offense level to 38, which, under the Guidelines, corresponds with a sentencing range of 262 to 327 months in prison. J.A. 699. The court sentenced Junkins to 240 months for counts one and four and 60 months for count two, to be served consecutively, for a total sentence of 300 months in prison.

This appeal followed.

## II.

Junkins appeals both the denial of his motions to suppress and his sentence. We address each in turn.

## A.

Junkins claims that all the evidence collected during and after the two traffic stops should have been suppressed because the stops themselves were unlawful. In reviewing a district court's decision on a motion to suppress, "we review legal determinations de novo and the court's underlying factual findings for clear error." *United States v. Thomas*, 908 F.3d 68, 72 (4th Cir. 2018). When, as here, the district court has denied the defendant's motion, we view the "facts in the light most favorable to the government." *United States v. Palmer*, 820 F.3d 640, 644 (4th Cir. 2016). Additionally, we review de novo whether

---

use converted drug weight to standardize the amounts of the various drugs before calculating a sentence using the Guidelines' drug weight table. *See* U.S.S.G. § 2D.1.1(c) cmt. n.8(B). The converted drug weight calculation involves multiplying the amount of a drug actually found (in grams) by the number of kilograms assigned to that specific substance, according to U.S.S.G. § 2D.1.1(c) cmt. n.8(D) (assigning 20 kilograms of converted drug weight for every gram of "Ice").

an officer had reasonable suspicion for an investigatory stop. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996).

When an officer temporarily detains someone during a traffic stop, the detention is a seizure under the Fourth Amendment and therefore must be reasonable. *See Whren v. United States*, 517 U.S. 806, 809–10 (1996). "Because a traffic stop is more akin to an investigative detention than a custodial arrest, we analyze the constitutionality of such a stop under the two-prong standard enunciated in *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015) (cleaned up). Under *Terry's* reasonableness test, a stop (1) "must be legitimate at its inception," and (2) "the officers' actions during the stop must be reasonably related in scope to the basis for the stop." *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017) (cleaned up).

Junkins claims that the August 1 stop wasn't reasonable in scope, violating *Terry's* second prong. And he claims that the November 30 stop wasn't legitimate at its inception, violating *Terry's* first prong. We disagree with both arguments.

1.

Junkins argues that the district court should have granted his motion to suppress the evidence seized during the August 1 traffic stop because the officers unlawfully extended the stop to allow for the canine unit to arrive on the scene. But the record, viewed in the light most favorable to the government, doesn't support that contention.

"[T]he decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. A traffic stop is a seizure, but "the Fourth Amendment tolerate[s] certain unrelated investigations

8

that [do] not lengthen the roadside detention." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015). A canine sniff test is one of those tolerable investigations, so long as the officers act within the scope of the "seizure's mission—to address the traffic violation that warranted the stop." *Id.* (cleaned up). In the context of analyzing a canine sniff's constitutionality, a seizure's mission includes "ordinary inquiries incident to the traffic stop," including "inspecting the automobile's registration and proof of insurance." *Id.* at 355 (alterations and internal quotation marks omitted).

An officer doesn't need separate reasonable suspicion to justify using a canine during an otherwise legitimate traffic stop "because a dog sniff is not a search" for Fourth Amendment purposes. *United States v. Branch*, 537 F.3d 328, 335–36 (4th Cir. 2008) (citing *Illinois v. Caballes*, 543 U.S. 405, 408–09 (2005)). But an alert from a drug sniffing dog gives probable cause to search a vehicle. *See Florida v. Harris*, 568 U.S. 237, 246–47 (2013); *see also Caballes*, 543 U.S. at 410 ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.").

Here, officers Carlson and Goad had probable cause to stop the car when they saw two traffic violations: (1) littering, in the form of a plastic straw flying out of the car's window, and (2) an obstructed license plate. *See* W. Va. Code §§ 17C-14-14 (Unlawful to Litter from Motor Vehicle) and 17A-3-15 (Display of Registration Plates). The only question here is whether the officers extended the stop beyond its initial scope to stall for the canine unit to arrive.

9

They didn't.  Carlson had just received confirmation that the Mustang was insured and was still writing citations when the dog alerted.  It's true that Goad's initial police report could be read to suggest that Carlson learned of the Mustang's insurance coverage before the canine unit arrived.  But during his testimony, Goad clarified that Carlson received the verification while the sniff was underway, and that Carlson was still writing citations when the dog alerted.

When, exactly, Carlson received the insurance verification is a factual question, which we must view in the light most favorable to the government.  *See Palmer*, 820 F.3d at 644.  Considering the facts from that perspective, the officers didn't impermissibly extend the stop because, while the dog sniff was taking place, they were still conducting "[o]rdinary tasks incident to a traffic stop includ[ing] . . . verifying the registration of a vehicle and existing insurance coverage."  *United States v. Bowman*, 884 F.3d 200, 210 (4th Cir. 2018) (cleaned up).  And once the dog alerted, the officers had probable cause to search the car.  *See Harris*, 568 U.S. at 250.

We therefore affirm the district court's denial of the motion to suppress the evidence obtained during the August 1 stop.

2.

Junkins next claims that the court erred in denying his motion to suppress the evidence seized during the November 30 stop because the officers unlawfully initiated a

traffic stop without seeing him violate a traffic law, given that he was parked at the time of the stop.

Determining whether a traffic stop was legitimate is an objective inquiry. If an "officer has probable cause or a reasonable suspicion to stop a vehicle, there is no intrusion upon the Fourth Amendment." *United States v. Hassan El*, 5 F.3d 726, 730 (4th Cir. 1993). In considering whether an officer had reasonable suspicion, "we look to the circumstances known to the officer and 'the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.'" *United States v. Smith*, 396 F.3d 579, 583 (4th Cir. 2005) (quoting *Terry*, 392 U.S. at 27). In short, "we must consider 'the totality of the circumstances—the whole picture.'" *Id.* (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)).

Here's the whole picture: Officers Sayre and Summerfield saw a Mercury parked in front of a convenience store. The only way to enter or leave the store was on a public road. The officers recorded the registration tag and confirmed with dispatch that it was expired. And it's undisputed that driving on a public highway without valid registration is unlawful in West Virginia. *See* W. Va. Code § 17A-3-1(a).

Based on those facts, the officers were entitled to draw the reasonable inference that Junkins had driven on public roads to reach the convenience store. In a similar case, a district court concluded that an officer's reasonable suspicion justified a traffic stop. *See United States v. Stewart*, 149 F. Supp. 2d 236, 242–44 (E.D. Va. 2001). There, the officer saw a car with heavily tinted windows in a parking lot. Under Virginia law, cars with heavily tinted windows can't drive on public roads, so the officer conducted a traffic stop.

11

A test after the officer initiated the stop confirmed that the tint on the windows exceeded the lawful limit. *Id.* at 241. In rejecting the defendant's argument that the officer made an unlawful stop, the *Stewart* court found that the officer hadn't "run afoul of the Fourth Amendment" because he "had an objectively reasonable suspicion based on specific and articulable facts that defendant had violated" Virginia law. *Id.* at 240–41.

Like the too-dark shade of the *Stewart* defendant's windows, the location of Junkins's car, the fact that it was running, and the reality that the driver needed to use public roadways to reach the convenience store were objectively reasonable indicia that Junkins had violated West Virginia law. Because the officers had reasonable suspicion that criminal activity had occurred, the stop was "legitimate at its inception." *Hill*, 852 F.3d at 381. Thus, the district court properly denied Junkins's motion to suppress evidence seized during the November 30 stop.

B.

Lastly, Junkins claims that the district court wrongfully attributed to him 52,460 kilograms of converted drug weight based on the allegedly unreliable testimony of witness CD. We review the district court's drug calculation for clear error, deferring "to a district judge's credibility determinations and how the court may choose to weigh the evidence." *United States v. Williamson*, 953 F.3d 264, 272–73 (4th Cir. 2020). "The defendant bears the burden of establishing" that the evidence "relied upon by the district court" was clearly erroneous. *United States v. Slade*, 631 F.3d 185, 188 (4th Cir. 2011).

When the amount of drugs seized doesn't reflect the scale of the offense, the court must estimate the amount of the controlled substance. *See* U.S.S.G. § 2D1.1 cmt. n.5.

12

"District courts enjoy considerable leeway in crafting this estimate" and "may 'give weight to any relevant information before [them], including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy.'" *Williamson*, 953 F.3d at 273 (quoting *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010)).

We've previously held that a witness's mere willingness to testify suggests that he's reliable. *See United States v. Whitted*, 785 F. App'x 948, 953 (4th Cir. 2019). And the Supreme Court instructs that a district court's decision to credit the testimony of a witness who "has told a coherent and facially plausible story that is not contradicted by extrinsic evidence" over the defendant's word "can virtually never be clear error." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985).

At its core, Junkins's argument is that CD's testimony is incredible and riddled with lies. We disagree. In calculating Junkins's converted drug weight, the district court relied on three aspects of CD's testimony. First, the court attributed 23,380 kilograms of converted drug weight to Junkins based on CD's testimony that Junkins gave him anywhere from 3.5 to 7 grams of meth every other day for a year.

Junkins claims this is clear error because it's implausible that he would give free drugs to CD. The district court, however, was entitled to credit CD's testimony that he and Junkins were close ("He's like a brother to me," J.A. 657) as support for CD's assertion that Junkins often gave him drugs. And CD's testimony isn't that he never paid for drugs—CD testified that he sometimes gave Junkins "some money for [his] troubles." J.A. 663. In the absence of extrinsic evidence to the contrary, we can't reverse the district court's

13

decision to credit CD's testimony simply because Junkins disagrees with it. *See Anderson*, 470 U.S. at 575.

Second, the court attributed 9,080 kilograms to Junkins based on CD's testimony that he had seen a one-pound chunk of crystal meth in Junkins's room. Junkins contends "this story from [CD] is simply unbelievable," relying on counsel's assertion that he has never encountered a piece of meth that large, either in his professional experience or through internet searches. Appellant's Br. at 32–33. No matter what counsel claims to have been his experience, we decline to rely on unsupported attorney statements as proof that a witness isn't credible.[5] *See United States v. Wilson*, 135 F.3d 291, 298 (4th Cir. 1998) (explaining that arguments by counsel can't be relied on as evidence if they are not based on facts in the record).

Third, the district court attributed 20,000 kilograms to Junkins based on CD's testimony that he'd been in a car with Junkins when he delivered a kilogram of methamphetamine for a drug sale. Junkins claims it was error to rely on this testimony because he disputed it and because the testimony differed from what CD told investigators in an interview two years earlier. But the inconsistency, to the extent it exists, is a credibility question. And once again, it wasn't clear error for the district court to resolve that question in the government's favor. *See Anderson*, 470 U.S. at 575.

---

[5] And even if we elected to take Junkins's counsel at his word, the result would be the same. That is, Junkins's converted drug weight would still land within Base Offense Level 36 after subtracting 9,080 kilograms from the district court's total calculation of 54,127 kilograms. *See* U.S.S.G. § 2D1.1(c)(2) (corresponding with 30,000 to 90,000 kilograms of converted drug weight).

Alternatively, Junkins argues that CD's testimony can't be reliable because he's a drug addict with a faulty memory. While a court may "consider a witness's status as a drug user or criminal history in assessing his or her credibility," status alone doesn't "render a witness per se unreliable." *United States v. Crawford*, 734 F.3d 339, 343 (4th Cir. 2013). Here, the district court considered CD credible despite his addiction and acted well within its "considerable leeway" by relying on his statements to craft the converted drug weight estimate. *Williamson*, 953 F.3d at 273.

In sum, CD's testimony, at the very least, had "sufficient indicia of reliability," so "the district court did not err at all here, let alone do so clearly."[6] *Id.* (internal quotation marks omitted).

III.

For the reasons given, the district court's judgment is

*AFFIRMED.*

---

[6] If anything, the district court "[gave Junkins] the benefit of the doubt" when it conservatively used the lower end of CD's testimony in calculating Junkins's converted drug weight. J.A. 698. For example, CD testified that he received a quarter ounce of meth every other day for a year to a year and a half, and the district court used a year in its calculation. *See United States v. Bell*, 667 F.3d 431, 441 (4th Cir. 2011) ("[W]hen the approximation is based only upon uncertain witness estimates, district courts should sentence at the low end of the range to which the witnesses testified." (cleaned up)).