**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-4093**

_____

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

CONTESSA DEE WILLIAMS,

Defendant – Appellant.

_____

Appeal from the United States District Court for the Eastern of Virginia, at Newport News. Roderick Charles Young, District Judge.  (4:19−cr−00019−RCY−LRL−9)

_____

Submitted:  March 27, 2023                    Decided:  August 11, 2023

_____

Before DIAZ, Chief Judge, RICHARDSON, Circuit Judge, and TRAXLER, Senior Circuit Judge.

_____

Affirmed by unpublished opinion.  Chief Judge Diaz wrote the opinion, in which Judge Richardson and Senior Judge Traxler joined.

_____

**ON BRIEF:** Andrew M. Sacks, SACKS & SACKS, Norfolk, Virginia, for Appellant. Jessica D. Aber, United States Attorney, Aidan Grano-Mickelsen, Assistant United States Attorney, Richmond, Virginia, D. Mack Coleman, Assistant United States Attorney, Eric M. Hurt, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Newport News, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

DIAZ, Chief Judge:

A jury convicted Contessa Williams of conspiring to distribute heroin and launder money. The district court applied a mitigating-role reduction based on Williams's limited role in the heroin conspiracy and sentenced her to a within-Guidelines sentence of 168 months' imprisonment. Williams challenges the sufficiency of the evidence for both convictions and argues her sentence was procedurally and substantively unreasonable. We affirm.

I.

A.

Williams met her codefendant Tracy Hall in 2013. They formed a romantic partnership and Hall moved into Williams's Virginia home soon after.

Williams knew Hall was a fugitive who had been on the run for four years. But she was initially in the dark about his large-scale heroin operation, as Hall told Williams he was selling only marijuana. Williams learned the truth when she found heroin in their washer and dryer. She was initially "kind of angry" and told Hall to get the heroin "out of the house." J.A. 225–26. But Hall explained that the drugs paid the bills, and Williams acquiesced.

As it turned out, the drug sales greatly benefited the couple's finances. Williams and Hall moved to Atlanta with their children, and Hall used drug proceeds to buy a large home. Later, $200,000 was stolen from that home, reflecting the considerable cash the

2

couple had on hand. And Hall bought tens of thousands of dollars in jewelry for himself and Williams.

Hall led the drug conspiracy and made regular trips to the Northeast to obtain kilogram-level quantities of heroin. His cousin, Marcus Joe, sometimes joined him on supply runs. Joe then distributed the drugs in Virginia through a network of street-level dealers, including Hall's father and other family members. In the years after Hall and Williams moved to Atlanta, the group distributed between 50 and 54 kilograms of heroin and took in $1.5 million in profits.

Despite her initial misgivings, Williams eventually joined the heroin conspiracy. She never sold drugs (though she did accompany Hall on one or two trips to resupply). Her main role was financial. When Joe brought drug proceeds to Hall and Williams's home every two weeks, Williams helped Hall count the money by hand and with a money-counting machine.

Williams also provided access to the banking system, which Hall couldn't use because he was a fugitive. She began making large cash deposits into both personal and business accounts just months after she started dating Hall, at a time when her direct-deposit payments from legitimate work were decreasing.

Williams's finances had other suspicious inconsistencies. For example, she reported on a 2014 personal bankruptcy petition that she had just $200 in savings and an $1,800 monthly income. But later that year, she deposited over $18,000 into a personal account within just two months. Williams used that account to pay for phones, cars, and residences used by the drug conspiracy.

3

Hall and Williams laundered drug proceeds through a liquor store they bought in Atlanta. The store was in Williams's name and the money to buy it came from Williams's business account. That account saw deposits of around $90,000 in the months after Williams opened it, including around $40,000 in cash.

Hall and Williams developed a scheme to transfer the remaining money to the account while avoiding detection by money-laundering prevention systems. Working through Joe, they distributed cash drug proceeds to family and friends. Those individuals used the money to fund personal and cashier's checks, which were deposited in Williams's account as "investments" in the liquor business.

Nearly $40,000 in funds entered Williams's business account in this way. And the use of cashier's checks (rather than making cash deposits directly into the account) allowed the conspirators to avoid triggering currency-reporting requirements for the business account.

In the end, however, the scheme's traces were clear. Many of the "investors" had financial difficulties inconsistent with the liquidity needed for their purported investments. And each investment came with suspicious banking activity.

For example, one couple sent nearly $20,000 to Williams's business account in a month, all while under a Chapter 13 repayment plan. One day, the couple made four cash deposits totaling $3,000 and then drew a cashier's check for the same amount. On another occasion, the couple deposited $6,000 in cash and the next day wrote Williams a personal check for the same amount.

Williams took on an increased role in the drug conspiracy after Hall was arrested on his outstanding warrants. Hall's phone (with his supplier's number) was seized during his arrest. So Williams arranged a three-way call where Hall gave Joe his phone security information, allowing Joe to get a new phone with the same number and contact the supplier. Since Hall dialed in from jail, that call was recorded. The recording shows the conspirators discussed the importance of Hall's phone to reach "the people up top" (which Hall later explained meant "the connection [he] was getting the drugs from, from Massachusetts"). J.A. 252.

In Hall's absence, Joe delivered the drug proceeds to Williams. Eventually, Williams began traveling from Georgia to Virginia to pick up money from Joe. One trip led to a Virginia traffic stop where authorities seized more than $20,000 in drug proceeds.

B.

1.

Williams was charged alongside several coconspirators with (1) conspiracy to distribute and possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 841 and 846, and (2) conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h). Hall and Joe took plea deals and testified against Williams at trial. Williams didn't testify, but the purported liquor-store investors testified in her defense, maintaining that their contributions were legitimate.

At the close of the government's case, Williams moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, which the district court denied. After presenting her defense, she renewed her motion with the same result.

The jury found Williams guilty on both counts.

2.

The presentence report grouped Williams's counts of conviction under U.S.S.G. § 3D1.2(a), and her Guidelines calculation was driven by the drug conspiracy, *see* U.S.S.G § 2S1.1(a)(1). Based on Hall's testimony that the conspiracy distributed between 50 and 54 kilograms after he and Williams moved to Atlanta, the presentence report attributed 50 kilograms of heroin to Williams. That gave Williams a base offense level of 36. She received a two-level enhancement related to money laundering and had a criminal history category of I, resulting in a guideline range of 235 to 293 months.

Williams objected to the 50-kilogram drug weight, arguing that the evidence was insufficient because Hall and Joe testified that she wasn't involved in day-to-day drug sales. The district court overruled her objection, finding it "irrelevant that [Williams] never handled the drugs" and concluding that the evidence showed "the conspiracy distributed 50 kilograms or more of heroin." J.A. 935.

Williams also objected to the presentence report's conclusion that she didn't qualify for a mitigating-role reduction. Here, the district court agreed with her. The court acknowledged that Williams had a major role in the money-laundering conspiracy. But it determined that Williams's sentencing exposure was driven by the drug conspiracy, and it found her role in that conspiracy to be more limited. The court's minor-role finding reduced Williams's offense level by five. As a result, her guideline range fell to 135 to 168 months.

6

The government sought an upward variance to 180 months and Williams sought a downward variance to the mandatory minimum of 120 months. The district court imposed concurrent sentences of 168 months on both counts.

This appeal followed.

II.

Williams contends that there was insufficient evidence to sustain her conspiracy convictions and that her 168-month within-Guidelines sentence is procedurally and substantively unreasonable. We consider her convictions before turning to her sentence.

A.

We review the district court's denial of Williams's Rule 29 motions de novo, considering whether each conviction is supported by "substantial evidence." *United States v. Colon*, 64 F.4th 589, 594 n.5 (4th Cir. 2023). We view the trial evidence in the light most favorable to the prosecution. *United States v. Robertson*, 68 F.4th 855, 862 (4th Cir. 2023).[1] And we reverse only if "no reasonable juror could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (cleaned up).

---

[1] The district court denied Williams's Rule 29 motion after the government's case and then Williams put on a defense before renewing her motion. The government argues we should therefore consider all the evidence (including the testimony of Williams's witnesses) and do so in the light most favorable to the government. *See* Appellee's Br. at 23 n.3; *cf. United States v. Gray*, 405 F.3d 227, 237 (4th Cir. 2005) (explaining that we may not consider defense evidence in a different situation: when the district court reserves judgment on a Rule 29 motion made at the close of the government's case). Williams doesn't contest this argument, and in fact relies on her defense evidence in her appeal, so we take the government's suggested approach.

1.

Williams first challenges her conviction for conspiracy to distribute and possess with intent to distribute heroin.

To convict Williams, the government had to prove: (1) that Williams entered an agreement with at least one other person to distribute and possess with intent to distribute heroin, (2) that Williams knew the agreement's purpose, and (3) that knowing that purpose, Williams voluntarily joined the conspiracy. *United States v. Hickman*, 626 F.3d 756, 763 (4th Cir. 2010) (citing 21 U.S.C. § 846).

Williams argues that Hall and Joe "substantially exonerated" her by testifying that she wasn't involved in the day-to-day operations of selling heroin. Appellant's Br. at 8. And she contends that Hall's testimony implicating her in the conspiracy was "hopelessly inconsistent," "inexplicable, and inherently incredible as a matter of law." *Id*. at 9. Neither argument persuades.

a.

Williams's first argument fails because each conspirator doesn't have to "agree to commit or facilitate each and every part of the substantive offense." *Salinas v. United States*, 522 U.S. 52, 63 (1997). The conspirators may instead "have a plan which calls for some conspirators to perpetrate the crime and others to provide support." *Id.* at 64. In that case, "the supporters are as guilty as the perpetrators." *Id.*

The government presented sufficient evidence for the jury to find that Williams knew Hall and Joe were distributing heroin and voluntarily agreed to support their efforts. Williams learned that Hall was selling heroin when she found it in their washer and dryer.

8

Although initially upset, Williams eventually joined the conspiracy. She received and counted drug proceeds, provided access to the banking system, and opened a liquor store using laundered funds. She also used her bank accounts (padded by cash from heroin sales) to pay for phones, vehicles, and residences used by the conspiracy. And she accompanied Hall on resupply trips and then helped reestablish contact with their supplier after Hall was jailed.

We've affirmed drug-conspiracy convictions based on similar evidence. In *United States v. Kennedy*, we upheld a conviction where the defendant "ran drug-related errands for [a conspiracy's leader] and assisted [the leader] in his efforts to collect money from other drug distributors." 32 F.3d 876, 886 (4th Cir. 1994). And in *United States v. Hatcher*, we upheld a conviction where the defendant's coconspirators sold drugs in front of him, stored drugs and drug-related funds in his home, and had the defendant drive them to pick up cocaine. 132 F. App'x 468, 478–79 (4th Cir. 2005).

Taken in the light most favorable to the government, a rational juror could have found that the evidence established that Williams knew Hall and Joe were engaged in heroin distribution and voluntarily agreed to join their efforts. That's enough to affirm Williams's conviction, even if she never sold drugs.

b.

We aren't persuaded otherwise by Williams's argument that Hall's testimony is "hopelessly inconsistent and contradictory." Appellant's Br. at 9.

To start, when assessing the sufficiency of the evidence, we don't second-guess the jury's witness-credibility determinations. *See United States v. Barronette*, 46 F.4th 177,

9

205 (4th Cir. 2022) ("A reviewing court is not entitled to assess the credibility of witnesses." (cleaned up)). Instead, "we assume that the jury resolved any conflicting evidence in the prosecution's favor." *United States v. Savage*, 885 F.3d 212, 219 (4th Cir. 2018) (cleaned up).

Moreover, we don't agree that Hall's testimony was "hopelessly inconsistent." Williams first points out that Hall's testimony that Williams "didn't want any drugs around her" was contradicted by his later testimony that Williams "want[ed] heroin around her." J.A. 301. But Hall reconciled these statements, explaining that Williams was initially angry about the drugs but softened once she learned they were his main source of income.

Williams next argues that Hall told her sister that he "never did nothing for [Williams] with no liquor store" and later disavowed that statement at trial. J.A. 302. But Hall explained that he lied to Williams's sister because he was "trying to get money" from Williams in exchange for "not testifying against her." J.A. 290, 302.

The jury could have believed Hall's explanations for his conflicting statements, and it's not our job to second-guess its determinations.

## 2.

Williams next challenges her conviction for conspiracy to commit money laundering.

We will affirm if there is substantial evidence that (1) Williams and at least one other person agreed to commit the crime of money laundering; (2) Williams knew of the agreement's unlawful purpose; and (3) Williams joined in the agreement willfully with intent to further the unlawful purpose. *United States v. Alerre*, 430 F.3d 681, 693–94 (4th

10

Cir. 2005).   Money laundering is conducting or attempting to conduct a financial transaction involving the proceeds of specified unlawful activity—here, the conspiracy to distribute heroin. *Id.* at 693.

Williams attacks her conviction on three grounds. First, she argues that "the lack of evidence supporting [her] membership in a heroin conspiracy[] equally attenuate[s] any alleged connection between her and the money laundering." Appellant's Br. at 12. Second, she points to Joe's testimony that he didn't communicate with her about the liquor store. Third, she says her investor-witnesses' testimony undermined the government's case. We find that substantial evidence supports her conviction.

Williams's first argument fails because, as discussed, there was sufficient evidence to connect her to the heroin conspiracy.

Her second argument fares no better. True, Joe answered "No" when asked if he had any "direct communications with Ms. Williams about starting the [liquor] store." J.A. 409. But the context of that testimony shows Joe's answer may have been limited to an occasion when he delivered a document to Williams through Hall; it's not clear that Joe meant he *never* communicated with Williams about the store.

More importantly, Joe's testimony says nothing about whether Williams and *Hall* agreed to commit money laundering. And Hall testified that he and Williams came up with the plan to distribute the drug proceeds to individual "investors." J.A. 235–36.

Williams's third argument focuses on her defense witnesses—the purported liquor-store investors—who testified that their contributions were legitimate. She argues her witnesses were "substantially unimpeached." Appellant's Br. at 12. But the government's

11

financial analyst testified about the financial difficulties faced by Williams's witnesses, casting doubt on their ability to access such large cash flows.  He also detailed the accompanying cash deposits and explained how using cashier's checks would avoid triggering currency-reporting requirements.

In essence, Williams asks us to weigh this conflicting testimony and find her witnesses more believable.  But under the substantial evidence standard, "we must assume that the jury resolved all contradictions" in the government's favor.  *Barronette*, 46 F.4th at 205 (cleaned up).  And taking the evidence in the light most favorable to the government, a rational juror could have found that Williams conspired to commit money laundering.

### B.

We turn now to Williams's within-Guidelines sentence, which she contends is both procedurally and substantively unreasonable.  We disagree on both fronts.

### 1.

Williams argues her sentence is procedurally unreasonable because there was insufficient evidence to support her attributed drug weight.

"We review the district court's calculation of the quantity of drugs attributable to a defendant for sentencing purposes for clear error."  *United States v. Williamson*, 953 F.3d 264, 272 (4th Cir. 2020) (cleaned up).  In cases without a drug seizure, the district court should "approximate the quantity of the controlled substance" and has "considerable leeway" in doing so.  *Id.* at 273 (cleaned up).

We find no clear error in the district court's attribution of 50 kilograms of heroin to Williams.  The district court based its finding on Hall's testimony that the conspiracy

12

distributed "50 to 54 [kilograms] of heroin" after he and Williams moved to Atlanta. J.A. 289. We've upheld reliance on accomplice testimony in prior cases, emphasizing defense counsel's opportunity for cross-examination, which occurred here. *See Williamson*, 953 F.3d at 272–73. And the district court observed Hall at trial and apparently found him credible.

Williams contends that the district court relied on only "a single strand of testimony." Appellant's Br. at 15. But that's not true. Hall's testimony on drug quantity matched his testimony that he made $1.5 million selling heroin after moving to Atlanta. J.A. 379; *see also* J.A. 220 ("Off of a kilo . . . I make 20- to $30,000 profit.").[2] And there was other evidence pointing to the conspiracy's scale.

Hall testified that he purchased the liquor store and expensive jewelry with drug proceeds and admitted that $200,000 was stolen from his and Williams's home. And the government's financial analyst testified that he couldn't identify a legitimate source for the large cash deposits in Williams's accounts or the money used to start the liquor store. While not as specific, this evidence lends credibility to Hall's 50-kilogram estimate. And it shows that the conspiracy's scale was foreseeable to Williams.

We're no more persuaded by Williams's contention that there isn't enough "evidence . . . as to exactly when these 50 kilograms were distributed" to tie the quantity

---

[2] The court may "use street values to calculate an amount of drugs equivalent to large sums of money seized from defendants" as long as it doesn't double count testimony on drug quantities and proceeds. *United States v. Uwaeme*, 975 F.2d 1016, 1019 (4th Cir. 1992).

13

to Williams. Appellant's Br. at 14–15. Hall made the 50-kilogram estimate in response to a specific question about distribution after he and Williams moved to Atlanta. *See* J.A. 289. So the estimate was time-bound. And as the government argues, it was likely "conservative," Appellee's Br. at 35, because Hall testified that Williams learned he was selling drugs while they lived in Virginia.

The district court avoided uncertainty by focusing on the period for which it had specific testimony from Hall. It didn't procedurally err in calculating Williams's attributable drug quantity.

2.

Williams contends that her sentence was substantively unreasonable for two reasons. Returning to her arguments about drug weight, she says it was "grossly disproportionate" to treat her like Hall, who played a more significant role in the drug conspiracy than Williams. Appellant's Br. at 15. And she says her "lifelong law-abiding status" renders her 168-month sentence unreasonable as a matter of law. *Id.* at 16.

Williams faces an uphill battle. Her sentence was within the guideline range, so it's presumptively reasonable, and it's her burden to rebut that presumption based on the sentencing factors in 18 U.S.C. § 3553(a). *United States v. Louthian*, 756 F.3d 295, 306 (4th Cir. 2014). We conclude she hasn't done so.

True, the district court attributed the same drug quantity to both Williams and Hall. But that's how the Guidelines work: A defendant is responsible for "all acts and omissions of others that were (i) within the scope of [] jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with

14

that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B). Plus, Williams received a five offense-level reduction based on her minor role in the drug conspiracy. So while she and Hall had the same drug weight, they didn't have the same guideline range. And in the end, Hall received 295 months' imprisonment to Williams's 168.

Williams's limited criminal history was also considered in her guideline range, through her criminal history category.

The district court considered the § 3553(a) factors and found a sentence at the top of the range was justified. It emphasized the drug conspiracy's seriousness and scope and Williams's role in facilitating its operations. And while the court acknowledged Williams's education, prior legitimate employment, and law-abiding history, it found those factors also suggested she wasn't a naïve or unwitting participant. *See* J.A. 984 ("It is stunning . . . that someone of her education would do with those bank accounts what she was doing.").

The court's chosen sentence was substantively reasonable, and we won't disturb it.

## III.

Williams's convictions are supported by substantial evidence, and we find no error in her within-Guidelines sentence. We therefore affirm the district court's judgment. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before this court and argument would not aid in our decision.

*AFFIRMED*

15